BODLEY AND OTHERS *v.* TAYLOR.

ERROR to the district court of the United States, for the district of Kentucky, in a suit in chancery.

Thomas Bodley, James Hughes, Robert Poague and Robert Campbell, citizens of Kentucky, brought their bill in chancery against John Taylor, a citizen of Virginia, in the *state* court for the district of Washington, from whence it was afterwards, by consent, removed into the federal court for the district of Kentucky.

The bill states that on the 17th of October, 1783, Henry Crutcher and John Tibbs made the following entry with the county surveyor, viz. " Henry Crutcher and John Tibbs enters ten thousand acres of land on a treasury warrant No. 18,747. as tenants in common; *beginning* at a large black ash and small buckeye marked thus (I. T.) on the side of a buffalo-road leading from the lower blue licks a north-east course, and about seven miles north-east by east from the said blue licks, a corner of an entry of twenty thousand acres made in the name of John Tibbs, John Clarke, John Sharpe, David Blanchard and Alexander M'Clain, running thence with the said Tibbs & Co.'s line due east sixteen

In Kentucky, it is a good ground of equitable jurisdiction, that the defendant has obtained a prior patent for land to which the complainant had the better right under the statute respecting lands; and in exercising that jurisdiction the court will decide in conformity with the settled principles of a court of chancery. Entries of land in Kentucky, must have that reasonable certainty which would enable a subsequent locator, by the exercise of a due degree of judgment and diligence, to locate his own lands on

the adjacent residuum. If the entry be placed on a road at a certain distance from a given point by which the road passes, the distance is to be computed by the meanders of the road and not by a straight line. If the entry be of a settlement and pre-emption to a tract of land lying on the east side of a road, the 400 acres allowed for the settlement right must be surveyed entirely on the east side of the road, and in the form of a square.

The call for the settlement right is sufficiently certain, but the call for the pre-emption right is too vague and must be rejected.

A defendant in equity who has obtained a patent for land not included in his entry, but covered by the complainants' entry, will be decreed to convey it to the complainants, but the complainants will not be required to convey to the de-

hundred poles, thence south one thousand poles, thence west sixteen hundred poles, thence north one thousand poles to the beginning for quantity." That the same having been surveyed, Crutcher assigned his half to Robert Rutherford, to whom and Willoughby Tibbs, (the heir of John Tibbs,) a patent was afterwards granted. Tibbs sold his right to Peyton, who sold a moiety thereof to Magill. Rutherford, Peyton and Magill, sold and conveyed the whole for a valuable consideration to the plaintiffs, by deed dated February 15, 1799.

That the defendant Taylor having, on the 22d of May, 1780, made the following entry with the county surveyor, viz. " John Taylor enters three thousand acres of land upon a treasury warrant adjoining John Walden, on the north side of Johnson's fork of licking, on the east and south-east sides, running up and down said creek, and north for quantity, to include an improvement made by Jacob Drennon and Simon Butler," *has caused the same to be surveyed expressly contrary to location,* and so as to interfere with your orator's claim aforesaid; *and having obtained a patent older than that obtained by the said Rutherford and Tibbs,* notwithstanding he knows his claim is surveyed contrary to location, and although requested, he refuses to convey to the plaintiffs. The prayer of the bill was, that the defendant should convey to the plaintiffs so much of the land included in the defendant's patent as interfered with the plaintiffs' patent; and for general relief.

The defendant by his answer denied the jurisdiction of the court, as a court of equity, because the plaintiffs stated in their bill no equitable ground of relief. He avers his ignorance of the plaintiffs' title, and that he did not know until within a few days then past, the mode in which his own location or survey was made. That he had employed one Ambrose Walden to cause them to be located. He denies all fraud in making his survey. He avers that he was a *bonâ fide* purchaser for a full and

valuable consideration, prior to the title claimed by
the plaintiffs. That no caveat' was entered against
his survey. That he regularly obtained his patent.
That a considerable part of his land has been cleared
and settled. That 20 years have elapsed since the
entry. That the land-marks and geographical objects
which were at that time visible, have been changed,
altered or destroyed by time.

*BODLEY*
*v.*
*TAYLOR.*

fendant the land which they have obtained a patent for, which was covered by the defendant's entry, but which, by mistake, he omitted to survey.

He contends that if he has surveyed and obtained
a grant for lands not described in his entry, and
which he had no right to survey, he ought not to be
compelled to convey them to the plaintiffs, unless
they will convey to him what he had a right to sur-
vey, and which they have surveyed, and for which
they have obtained a patent. That the plaintiffs' en-
tries cover almost all the lands which the defendant
could have surveyed under his entry. That by the
plaintiffs' delay the defendant has lost the power to
locate his warrants elsewhere, if they are improperly
located, which he denies.

He states that his entry was dependent on John
Walden's, which depended upon Ambrose Walden's,
which depended upon Jacob Johnson's. That Jacob
Johnson's was first surveyed by the surveyor who
surveyed the entries of the Waldens, and of the de-
fendant. That although Jacob Johnson's survey
was afterwards suppressed, yet that did not alter the
actual location of the two Waldens and of the de-
fendant. That his survey is correctly made accord-
ing to the laws of Virginia when it was made, and
while Kentucky was part of Virginia, and that by
the same laws, and the compact between Virginia
and Kentucky, at the time of separation, his prior
patent, founded upon a prior equity, and obtained
without fraud, cannot be vacated.

A survey and connected plat was made under an
order of the court, and according to the directions of
each party.

A jury came, according to the custom of Ken-

BODLEY
v
TAYLOR.

tucky in chancery suits, and being sworn to inquire of such facts as should be submitted to them, found the following facts, viz. That the place designated on the connected plat by the letter A. is the place called for as the beginning corner of John Tibbs & Co.'s entry of 20,000 acres, dated July 31, 1783, on the buffalo road leading from the lower blue licks to *Limestone*, which corner is also the beginning of an entry of 10,000 acres made the 17th of October, 1783, in the names of Henry Crutcher and John Tibbs, under which the complainants claim; copies of which entries are annexed to their verdict.

The following facts were agreed by the parties, viz.

2. That the entry of 20,000 acres in the name of John Tibbs and others, and a survey made thereon, for 16,000 acres on the 8th of June, 1796, were assigned to the complainant Bodley, who obtained a patent therefor in his own name dated 21st of April, 1798, and afterwards conveyed one undivided moiety thereof to the complainant Hughes, by deed duly recorded.

3. That the entry of 10,000 acres was made on the 17th of October, 1783, in the name of Henry Crutcher and John Tibbs, surveyed 14th March, 1784, registered 31st December, 1784, and patented in the names of Robert Rutherford, assignée of Henry Crutcher, and Willoughby Tibbs, heir at law of John Tibbs, deceased, 26th August, 1790, was purchased by Bodley 26th September, 1798, and conveyed to all the complainants jointly by deed duly recorded, dated the 15th of February, 1799. That the defendant's survey of 3,000 acres was made on the 1st of September, 1785, registered the 1st of November, 1785, and a patent obtained therefor dated 21st of November, 1786.

4. That the grants issued by the register of the Virginia land-office do not bear regular dates agreeably to the times the surveys were returned, but in

many instances the elder patent has issued on surveys returned several months after surveys on interfering claims were registered.

BODLEY
v.
TAYLOR.

5. That the surveys of Jacob Johnson's settlement and pre-emption, as stated to have been surveyed in the *defendant's first fact*, (hereafter stated,) were made by the direction of Simon Kenton, his agent, who was also locator of the claims which call to adjoin the said Johnson's surveys, and were never admitted to record.

6. That Ambrose Walden's survey was made on the 29th of November, 1785, John Walden's the 27th of December, 1785, and Jacob Johnson's settlement and pre-emption, as represented on the connected plat by lines thus, (OOO,) was made on the 9th of April, 1789, registered and patents issued thereon to John Reed and Arthur Fox, assignee of Johnson, dated the 20th of February, 1793.

7. That more than one entry and survey has been made on almost all the good land in the state of Kentucky.

8. That the several claims, water-courses, improvements, objects and distances laid down on the connected plat, reported by the surveyor, are truly laid down and reported.

### Facts for the defendant.

1. That the settlement and pre-emption of Peter Johnson, heir at law of Jacob Johnson, after being entered with the surveyor, were actually run out and surveyed as designated on the connected plat by the letters and figures M. N. 2 & 3. that the said surveys were made by a surveyor legally qualified to make the same, prior to the dates of the surveys made for Ambrose Walden, John Walden, and the defendant.

2. That the land surveyed for the said Peter

Johnson, upon the said right of pre-emption, there are now 300 acres of cleared land, upon the said survey of Ambrose Walden 200 acres, upon John Walden's 400, and upon the defendant's 300 acres of cleared land.

3. That on the 22d of May, 1780, the land on which the entries of Johnson, Ambrose Walden, John Walden and the defendant, were made, was uncultivated, and the country for fifty or sixty miles on all sides without an inhabitant, except Indians, by whom it was much infested, and only occasionally visited by hunters and land-jobbers.

4. That on the 22d of May, 1780, and prior thereto, there were many cabins, marked trees, hunting camps and improvements then plain and notorious on Johnson's fork, and the other branches of licking, of which there remain now no traces, and which are now wholly incapable of proof as to what was their exact position.

5. That since that time a great change has taken place in the appearance of the country generally round, and at the place where the defendant's entry lies. That the country is now thickly settled, and in high cultivation. That great changes have taken place in the names of streams, roads and other objects, and that few of those who frequented that part of this country in the year 1780, are now alive.

6. That the complainants, Bodley and Hughes, assignees of Tibbs & Co. are the proprietors of the 16,000 adjoining the 10,000 acres in the bill mentioned.

7. That the cabin represented on the connected plat as Jacob Drennon's is the improvement called for in his certificate for a pre-emption, which was claimed for him before the commissioners by Simon Kenton, who also located the complainants' claim of 3,000 acres.

8. That the place designated on the plat, on the south side of Johnson's fork as a cabin, represents a cabin built prior to the first of May, 1780, by Simon Kenton, otherwise called Simon Butler and Jacob Drennon.

It was also agreed between the parties that on and before the 21st of February, 1780, the lower blue licks were generally and notoriously known by the appellations " the blue licks," and " the lower blue licks," and that the road on which the complainants claim their beginning was then generally and notoriously known by the name of the upper road.

That the three buffalo-roads laid down upon the connected plat, in February, 1780, and before, led from the lower blue licks as represented.

That upon any reasonable plan of surveying the defendant's entry of 3,000 acres, it would be covered by the younger entries of 10,000, and 16,000 acres, the property of the plaintiffs, and would include land of equal or better quality than that which it now covers.

That the land in dispute is of more value than 2,000 dollars.

The following are the entries made by the parties respectively, viz.

" January 7th, 1780.

" Peter Johnson, heir at law of Jacob Johnson, deceased, this day claimed a settlement and preemption to a tract of land in the district of Kentucky, lying on the east side of the buffalo-road leading from the blue licks to Limestone, nine miles from the lick on the upper road, by the said decedent's raising a crop of corn in the year one thousand, seven hundred and seventy six; satisfactory proof being made to the court, they are of opinion that the said Peter Johnson, &c. has a

BODLEY
v.
TAYLOR.

right to a settlement of four hundred acres of land, to include the above locations, and the pre-emption of one thousand acres adjoining; and that a certificate issue accordingly."

" February 21st, 1780.

" Peter Johnson, heir, &c. enters 400 acres in Kentucky, by virtue of a certificate, &c. lying on the east side of the buffalo-road leading from the blue lick to Limestone, nine miles from the lick on the upper road."

" May 22d, 1780.

" Ambrose Walden enters 1,333 acres upon a treasury warrant on the east side of Jacob Johnson's settlement and pre-emption on the waters of Johnson's fork a branch of licking, to include two cabins on the north side of said fork, built by Simon Butler, and to run eastwardly for quantity."

" May 22d, 1780.

" John Walden enters 1,666 2-3 acres upon a treasury warrant, joining the above entry on the south and south-east, to include three cabins built by Simon Kenton, running east and south-east for quantity."

" May 22d, 1780.

" John Taylor enters 3,000 acres upon a treasury warrant joining John Walden on the north side of Johnson's fork of licking, on the east and south-east side running up and down the said creek and north for quantity, to include an improvement made by Jacob Drennon and Simon Butler."

The court below then proceeded to pass the following interlocutory decree :

" It is decreed and ordered that Duvall Payne, of

Mason County, do go on the land in controversy and survey the claim of the complainants, agreeable to their entries. Then survey the settlement entry of Peter Johnson, heir of Jacob, to begin at a point nine miles below the lower blue licks on the buffalo-road as it meanders leading to the mouth of Limestone, thence east so far that a line north two hundred and fifty-three poles will give 400 acres on the east side of the road. That he then run out the pre-emption of Johnson in a square to the cardinal points, to lay around the settlement, and give an equal proportion of land on the south and east which is to direct the lines on the north and west.

" That he survey Ambrose Walden's entry on the east of Johnson's pre-emption, then John Walden's in equal proportions on the south and east of Ambrose, and the defendant's on the south and east of John Walden, in equal proportion.

" That he then ascertain the interference between the claims of the complainants and defendant, which lie without the limits of the defendant's entry as it is now directed to be surveyed; and within the lines of the complainants' entry, mark the lines and make corners to this interference when ascertained, and make report to the next court."

After this interlocutory decree, and before the surveyor made his report, the following facts were agreed and admitted by the parties:

1. " That there is at the blue licks a salt spring on the south side of licking, which is south 36 deg. west 82 poles from another salt spring on the north side of licking."

2. That there are at the blue licks about 500 acres of land trodden and licked away by the resort of buffaloes and other wild beasts.

3. That the connected plat in this cause, and the survey executed in pursuance of the interlocutory

BODLEY
v.
TAYLOR.

decree, are made out by superficial, that is surface mensuration, and the distance from the blue licks to the respective beginnings of the parties' entries, ascertained in the same way.

Afterwards the surveyor made his report, with a plat stating that he had made the survey according to the decree, and found " *that* part of the defendant's survey which is included within his survey when laid down agreeable to the decree, and is also within the complainants' survey, to be 1,076 acres," " and *that* part of the defendant's survey which is included in the complainants' entry when laid down agreeable to decree, and will not be in the defendant's survey when made agreeable to the decree, is in two tracts, one containing 2,034 acres and 24 poles," " the other containing 182 1-2 acres."

Whereupon the court decreed and ordered that the defendant should, before the 1st of December then next, convey to the complainants by deed, with warranty against himself and those claiming under him, the two tracts not within his survey as laid down by the order of the court, and which were within the complainants' survey, amounting to 2,216 1-2 acres; and should pay the costs of suit.

Each party brought his writ of error.

The cause was argued at February term, 1806, by the defendant *Taylor*, and *P. B. Key*, for the original defendant, and by the complainant *Hughes*, for the original complainants; and again at February term, 1807, by *H. Clay* and *P. B. Key*, for the original defendant, and by *Hughes* and *H. Marshall*, for the original complainants; and again at this term by *Pope*, for the original complainants, and *P. B. Key*, for the defendant.

Argument for *Taylor*, the original defendant.

The bill discloses no facts which give an equitable jurisdiction to the court. It simply charges that

the defendant (Taylor) *has surveyed contrary to his entry.* It charges no fraud, it alleges nothing to show that a *caveat* would not have given a full, plain, and adequate remedy; and it shows no sufficient reason why the remedy by *caveat* was not pursued.

Virginia borrowed the term *patent,* or *grant,* from the English law, where it means a mode of conveyance by the sovereign power. The land law of Virginia considers it as the consummation of title, and directs the *register* to endorse thereon "*that the grantor hath title.*"

By the compact between Virginia and the inhabitants of Kentucky, in 1789, when Kentucky was erected into an independent state, it is declared (in § 7.) "that all private rights and interests of lands derived from the laws of Virginia, prior to such separation, shall remain valid, and shall be determined by the laws now existing in this state." If therefore the court had equitable jurisdiction in this case, it must have been bestowed by the English or Virginian precedents, and not by the practice in Kentucky since that compact. Kentucky could not, by *law,* affect those rights and interests, and, *a fortiori,* they could not be affected by the *practice of her courts.*

English precedents are therefore admitted to apply; and it is also admitted "that where a *caveat* was entered, or directed to be entered, and a hearing prevented by fraud or accident," the chancery in Virginia exercises jurisdiction; but it is denied that either in England or Virginia, it has ever taken jurisdiction over the simple legality of the title; that it has ever constituted itself into a court of errors to examine whether surveys correspond with entries; or attempted to perpetuate questions in chancery intended by law to be laid at rest by the rapid remedy of a *caveat.* The cases of *White and Jones,* 1 *Wash.* 116. and *Burnsides and Reid,* 2 *Wash.* 48.

BODLEY
v.
TAYLOR.

will confirm this doctrine, that fraud destroys, but the absence of it saves, a patent.

In the *allegata*, a survey "contrary to location" is made the only basis of jurisdiction. In the *probata*, the only auxiliary ground which appears, is a certificate of a practice by a register of *Virginia*, given by a register in *Kentucky*, "that a registry is kept of the returns of surveys, but that patents do not issue according to their priority."

Neither such a registry nor such an order in issuing patents are required by law. An act of the register, not required by law, cannot affect the title, and cannot be a ground of jurisdiction.

The jurisdiction rests therefore on the single allegation "that the defendant's survey was made contrary to his location."

The question then is, who has the legal title?

As subordinate to this question it is contended,

1. That the defendant's entry is legal.

This is admitted both by the bill and the answer; 1. By charging the survey to have been made contrary to location; and, 2. By ordering a survey to be made agreeable thereto in the court's opinion. But the legality of the defendant's entry is proved, for the purpose of contrasting it with the illegality of that of the complainants.

The specialty of entries or locations, required by the land law, consisted of *geographical objects*, and not of *geometrical protraction*. The geography ought to be natural, and not artificial; because it was to convey information to those about to locate, upon reading the previous locations at the surveyor's office. It was a previous knowledge of the face of the country to which these locations were to convey a notice. No previous knowledge of chopping

a tree at the time of location could exist. Therefore, a nail driven into a tree, or letters marked on it, could be no notice to locators' reading an account of it at the office, however well informed of the geography of the country. The law did not intend to force them to delay locations, at the risk of losing the land, to go in search of such artificial geography.

<span style="float:right">BODLEY<br>v.<br>TAYLOR.</span>

A *settlement* is the only species of artificial geography recognised by the law. This being a previous mark in the face of the country, was a notice addressed to a previous knowledge of it. Still rights founded upon this artificial geography were to be established, by the law, within a very short period, to obstruct the inconveniences which might result from making even this very visible, artificial geography the basis of notice.

Johnson's settlement was recognised and established within the limited period. This settlement, although it was artificial geography, yet it was a more notorious and visible object than the two letters cut on a tree. It was a geographical object recognised by law; but the letters were not. Johnson's entry calls for several geographical objects, " the *upper road*," " *leading to Limestone*," " *on its east side*."

The entries of the Waldens, and of the defendant, by linking themselves to Johnson's, obtained all its specification. If Johnson's was good, the others needed no further precision.

Yet Ambrose Walden's specifies " *Johnson's fork*," and " *two cabins*." J. Walden's calls for *three cabins*.

That of the defendant specifies " *Johnson's fork*," and " *a cabin*," the site of which is agreed to have been at the place marked on the plat; but which is not on his land as surveyed by the order of the court.

BODLEY
v.
TAYLOR.

If these entries were good at the time they were made, they never can be adjudged bad afterwards. Time, by defacing the natural geography, and destroying the witnesses to prove it, cannot destroy an entry originally good. We cannot now be obliged to test, by artificial geography, the validity of a survey made according to the natural geography as it ▪ ▪ed at the time it was made.

The presumption, arising from a patent, certainly is, that the survey was made according to the entry; and that presumption ought not to be contradicted by less evidence than was in existence at the time the survey was made. At the time Johnson's survey was made, his settlement was in existence. Its actual site cannot now be proved; it is no longer visible. Is not the patent, then, conclusive evidence that his survey was according to his entry?

The *caveat* process is a positive provision against the effects of time. If a caveat could be instituted many years after a patent, after many years' possession, after 1,200 acres had been cleared, 20 years after the entry, 15 after the survey, a new moulded geographical face, and a generation of witnesses dead, it would subject the goodness of entries, intended to be permanent, to unceasing fluctuation. It would be to make titles bad in proportion to the length of possession under those titles.

What is this suit but an attempt to evade the limitation which the law has wisely prescribed for the process of *caveat?* Of what use is a limitation of caveats at law, if caveats in chancery are to be unlimited? Had a caveat been prosecuted in proper time, the actual site of Johnson's plantation and corn field would have been ascertained; and would have controlled the distance of nine miles. But now they make the nine miles control the actual settlement, and attempt, by course and distance, and geometrical protraction, to destroy a survey made originally by geographical objects. If the distance would not *then* have controlled the actual site, it cannot *now*. What was law then, must be the law now.

The *onus probandi* lies on the complainants. They have alleged that the defendant's survey was contrary to his location. In order to support this allegation they must first prove where his entry was, and in order to do that, they must show where was Johnson's *actual* settlement. They must do it absolutely and not hypothetically. The law does not allow that to be a settlement which is to be found only by course and distance.

A presumption of weight enforces the reasonableness of requiring of those who would avail themselves of a geographical object, proof of its site, when they use that site to show in themselves a title to property long held by others. It is, that a survey, made when the site of the object was visible, is more likely to correspond with it, than one made after it is lost. The less probability ought not to overthrow the greater. The first presumption is supported by strong circumstances in addition to the visibility of Johnson's settlement. Why did the defendant take worse land, as it is agreed he did, if he ought to have taken better? Because he was controlled and limited to it by Johnson's real settlement. This construction of his entry, contemporaneous with the existence of the real settlement, contrary to his own interest, strongly enforces the reasonableness of adhering to the law by requiring from those who assail an old title, and long possession, proof more than presumptive.

The presumption arising from the exact admeasurement to fix a site for Johnson, is extremely weak. In claiming his pre-emption, did Johnson measure? or did he compute? The country was then unpopulated, and infested by Indians. If he measured, from whence did he begin? The *lick* consisted of several salt springs, and 500 acres of land were licked and trodden away. Did he pursue the meanders of the road, or proceed in a straight line? By following a conjecture, subject to all those casualties, to fix the site of Johnson, the place may be mistaken. By this mistake the title obtained when that site was

not matter of conjecture, may be defeated, although the survey may have been made according to the entry.

An old title ought not in this manner to be destroyed by a new speculation, nor the rules of evidence relaxed to defeat a long possession.

Old titles and possession are never overturned, but saved by presumptions. In this case the title is supported by other presumptions arising from the facts stated in the record. The entries call for cabins and other geographical objects, disclosing an intimate knowledge of the country. Kenton, the locator, possessed this knowledge, and directed the surveys whilst the corn field and domicil of Johnson must have been visible. Which is most probable, that Kenton knew where Johnson's actual settlement was, and that he surveyed accordingly? or that Johnson's settlement was the place found by the geometrical conjecture, and that Kenton surveyed contrary to the known location?

But we contend that the defendant's survey does not want the aid of presumption.

The subject of entries and surveys are so connected, that they must be blended in the argument.

It must be understood what a *location is*, before it can be known whether a survey conforms to it.

By the third section of the land law " the party shall direct the location so specially and precisely as that others may be enabled with certainty to locate other warrants on the adjacent residuum." The land law of Virginia consists of two acts of assembly. Each uses the term location; the first explains what is meant by the term in the second. An actual settler was entitled to 400 acres to be surveyed "*including the settlement*." A settlement is described by the law to consist in " raising a crop of corn," &c. A settlement then was a visible, geographical object, which fixed

the location of the 400 acres.. The actual settler
had also a right of pre-emption to 1,000 acres to be
surveyed " *adjoining* the land allowed for settle-
ment." In the mode of surveying Johnson's right,
according to the decree of the court below, there is
no proof that the actual settlement is included.

Some latitude is left to the party in surveying his
settlement right, under the law.

By appointing judges to decide upon these settle-
ments and pre-emption locations; to keep a record
of the " quantities and locations" which they allow-
ed; to give a certificate describing " the particular
location;" and to furnish the register and surveyor
" with a schedule of such certificates," it is demon-
strated that the legislature considered their judg-
ments to be locations ; and that these locations were
unalterable. They were the acts of judges, not of
parties. Johnson's location is a judicial act, and a
judicial exposition of the law. Johnson could not
alter it. The certificate is directed to be delivered
to a surveyor, and upon his receiving it, not a new
location, but an entry is allowed " in such way, and
upon such terms, as are therein prescribed."

If the court below has such a latitude as to ex-
clude Johnson's settlement from his survey, had
not he some latitude to survey so as to include it?
The factitious settlement assumed by the court was
included in Johnson's first and second surveys, but
not in the third made by order of the court.

To affect this a process occurs, under the decree,
of a novel kind.

It is assumed that a nine mile point, measured
straight, or crooked, is Johnson's settlement. The
certificate is construed to mean that not an acre of
Johnson's 1,400 shall approach nearer the licks than
nine miles, and his plantation or settlement is
placed, in the face of the law, and of probability,
on an edge of a large tract. By what authority

could the court do this? The only condition of the law is, that the settlement right (*i. e.* the 400 acres) should include the settlement or improvement; and that the pre-emption right, (*i. e.* the 1,000 acres) should adjoin the settlement right. With this restriction only, and that respecting the shape of surveys, (viz. that their breadth should be at least one third of their length,) Johnson had a latitude to survey it as he pleased. How can the court, at this distance of time, deprive him of that right long after he had exercised it.

But after having once exercised it he could not alter it. Can the court now do that for him which he could not have done for himself? and thereby overturn titles dependent upon his location?

In fact, this restriction is only extracted from an incorrect construction of Johnson's certificate.

This certificate consists of two parts; the claim and the judgment.

The court of commissioners received the claims verbally, and the clerk stated them in his own language. Johnson's claim was a settlement right, and to obtain it, he had only to prove where his settlement lay, that the commissioners might describe it, and notify the register and surveyor. The settlement being ascertained, the law locates the land by the references " *include*" and " *adjoin.*" All beyond, ascertaining the situation of the settlement, was surplusage, and idle.

This was a *settlement right*, and not a *village right*. This is evident from the certificate itself.

1. Because it mentions the date of the settlement, 1776, and adds the words " before the 1st of January, 1778."

2. It uses the words of the law, applicable to a settlement right, viz. " to *include* the settlement;"

whereas the terms of the law relative to village rights are, " *adjacent*, or convenient to the village."

3. No village is mentioned.

4. It mentions *raising a crop of corn*, which was the proper foundation of a settlement right.

But the decree of the court below turns on the word " *lying*" in the certificate; whether it means a *settlement* " lying" or a settlement *right* " lying" on the east side of the road? Whether Johnson, in using that expression, meant to apply it to the settlement which was the foundation of his claim, or to the thing claimed in consequence of that settlement?

It refers, says the decree, not to the *settlement*, but to the 400 acre settlement *right*, and to the 1,000 acre pre-emption.

If the whole 1,400 acres could be made the object of reference to the word " *lying*," then by declaring that no part of them should approach nearer to some arbitrary point of the 500 acre lick than nine measured miles, Johnson is thrown entirely to the east of the supposed settlement, and the chief part of his, the Waldens', and the defendant's patents transposed to the complainants' 16,000 acre entry.

But if the word " *lying*" refers to " the settlement," then it is obvious that Johnson's survey No. 2. includes the assumed point of settlement with far greater coincidence with the Kentucky precedents; and the survey No. 1. with more still than the survey No. 3. which shoots out an irregular proboscis from the settlement right, to get at the settlement point.

By these precedents, the settlement is placed in the centre of the settlement right, and the settlement right in the centre of the pre-emption right,

surveying from the settlement itself to the cardinal points for quantity.

The law, by saying that the pre-emption right shall *adjoin*, not the settlement itself, but the settlement *right*, countenances the idea that it could not adjoin the actual settlement, because that had been included in the settlement right. But the survey No. 3. makes the pre-emption adjoin the settlement itself.

The decree goes upon the idea that the certificate locates the 400 acre settlement right, and the 1,000 acre pre-emption right on a certain point, on the east side of a road, nine miles from the licks.

But a settlement. *right* is not even mentioned or alluded to in the whole certificate, whose only object was to establish the fact that a settlement actually had been made at a certain place, and the number of acres which the settler claimed, or which the commissioners allowed in consequence of such settlement. The right was a legal consequence of establishing the settlement, and could not be located but by locating the site of the settlement. When that site was established, the law located the right.

Some stress is laid upon the words " to include the above location." If the " *above location*" was a location of the whole right, how could the right include the location? This would be to say that a thing may include itself. The thing enclosed must be less than the thing enclosing. Hence it results that the " above location" was not a location of the settlement *right* but of the settlement only.

By allowing the 400 acre tract to include the located settlement on a geographical point located or situated nine miles from the licks, on the east side of the road, and the 1,000 acre tract adjoining the 400 acre tract, and including it, the law is followed correctly, and exactly fulfilled.

To comply with the idea of the decree, great bodies of land must be compressed into a particle at the end of the nine mile line, and then be expanded for surface. If the decree had suffered it to expand equally in every direction from that point, the defendant's title would have been safe. What reason was there to limit this expansion to one particular direction. If the given distance must be violated to gain the required surface, why not expand towards the licks, as well as from them?

But Johnson's second survey has been perfected by acquiescence. There was no complaint, no caveat. Suppose the defendant had surveyed upon the ideal basis of Johnson assumed by the court below, and that universal acquiescence had perfected his title in another place; could he have held his land by a connection with no title of Johnson, whilst a perfect title existed at another place, with which, in his entry, he had connected himself?

If Johnson's and the Waldens' titles are good, the defendant's is good also. Those titles can never be affected by a suit in which they are not parties.

Johnson's entry is 25 years of age, his survey 16, his patent 12; neither has been questioned to this day, by caveat or suit.

But the continuity of the chain from Johnson to the defendant is said to be broken by the want of an "east side" on the buffalo-road, by the want of an "east side" to Johnson's first and second survey, and by want of an "east and south-east sides," by John Walden. There being no such "east sides" Johnson could not lie on the "east side" of the road. A. Walden could not lie on the "east side" of Johnson, nor the defendant on the east and south-east sides of John Walden. Accordingly the decree has provided in the survey No. 3. an "east side" for Johnson, by a north and south line for A. Walden to adjoin, and similar sides for J. Walden and the defendant, violating the positive provision of

law as to the length and breadth of surveys. But, in the language of these locations, " on the east side" means no more than that the lands are to lie eastward, or on the easterly side or part of. They do not necessarily suppose that the surveys must absolutely have an exact north and south line. It means *aspect*, one part of a body opposed to another part of the same body. In this sense every tract of land must have an east side.

As locators had a very considerable latitude in making their surveys; and as entries might join each other before any of them were actually surveyed, if the principles of the decree are just, and nothing but a north and south line will make an east side, it would put it in the power of the first locator to prevent the second locator from joining him at all, and of course to destroy the validity of his neighbour's entry. This could not be the intention of the law. Kenton used the term " side" with a knowledge of this latitude. He therefore did not intend to use it in a sense which would destroy his locations. He used it merely to show the geographical relation of one entry to another.

Again; these entries call, not for surveys, but for each other. In John Walden's the words " joining the above *entry*" are expressly used. How can the east side of an entry be converted into a north and south line of a subsequent survey. The calls are to couple entries to entries ; subsequent entries to previous entries, not previous entries to subsequent surveys.

It is by blending geometry and geography, in considering entries. that inaccurate constructions prevail; whereas the latter only is necessary.

But the complainants' entry is bad in not giving any geographical notice. The letters I. T. cut in the bark of a tree do not constitute a geographical object. A location was required not to enable a man to find his own land, but to enable others to avoid

it. Admit that the complainants can find their beginning, the letters I. T., it does not affect the question whether this artificial geography can be a good location. We may find what we hide, but what we can hide is not a geographical feature in the face of the country. An object taken as the basis of an entry ought to be such as a person acquainted with the country might have known before the entry was made.

The defendant's entry had not been surveyed when the complainants' entry was made. It had not then mistaken its area, as the decree now contends. It was a good entry, as the decree admits. Being good, the title to the land it covered was vested in the defendant, not liable to be re-entered, and not capable of being devested by a younger entry. The younger entry therefore was void as to this vested title. Being void, it could only be made good by a survey and patent. The elder entry, if originally void also, is made good by the same means.

If the defendant has no title, so far as his entry was void, the complainants can have no title so far as theirs was void; or if subsequent events could perfect theirs, the same events could perfect his.

If the complainants have the eldest survey for the lands said by the decree to have been within the defendant's entry; he has the eldest for those said to be within theirs.

The parallel in the cases is complete, but the decree has not seen it. It has given the complainants the land they claim of the defendant, and also that which the defendant has a right to claim upon the same principles.

Is an entry, a survey, or a patent, the basis of a title? The incipient and the final step, the entry and the patent, are for the defendant. The complainants have the eldest *survey* as to the 10,000 acre entry. But neither the survey nor its registry can

BODLEY
TAYLOR.

give priority of title. The incipient and the final act being in favour of the defendant, equity will not deprive a fair purchaser of the advantage, in order to do him wrong.

The law directs an endorsation on the patent "that the patentee has title." The decree declares " that his title shall depend on parol testimony fór 10, 15, or 20 years."

How far courts of equity are bound by the positive law, is still a question. Whether, with the courts of Virginia, they will stop at the case of fraud or accident having prevented the institution of a caveat, followed speedily by an application to equity for relief, or whether they will examine, during 20, 30, or 100 years, every circumstance capable of being examined by caveats, is to be the precedent.

The law and equity of the case are so intimately blended, that in discussing the one, much of the other has been anticipated.

Two grounds of equity are set up by the complainants.

1. An irregularity in the defendant's survey. They make no objection to his entry, and by charging the survey with non-conformity, they admit that the entry may be conformed to; they pretend also to show in what manner.

2. That one of their surveys was first made, returned and registered.

The defendant on his side claims equity too:

1. From length of time. Though courts of equity are not bound by acts of limitation, in some cases, they are in others. There must be some ingredient to take a case out of an act of limitation,

after it has fallen within it. The *caveat* process is an act of limitation.

Even in cases most deemed by equity to fall under the strict letter of laws of limitation, courts of equity, in computing a reasonable length of time, will respect such laws as legislative computations founded in reason.

Written testimony is supposed, by the laws of Virginia, to be a reasonable object of confidence, until twenty years have expired. Precedents in chancery have diminished this term to eighteen. Oral testimony maintains its credibility in some cases for five years, in others for a shorter term, and in contests capable of being tried by *caveat*, for six months only. This computation is made upon the particular circumstances inimical to such testimony in every case. These circumstances induced the legislature, in cases of *caveat*, to refuse credibility to oral testimony for more than six months. But the complainants demand it for twenty years.

2. The defendant claims equity from the surveyor's negligence, in not having surveyed with the regularity required by law.

The law is imperative that he should give notices.

Except for this breach of duty in the officer, the defendant would have surveyed and patented before the complainants entered. And a survey and patent could not have been destroyed by a subsequent entry.

Equity considers that as done which ought to have been done. The neglect of the surveyor was a real injury to the defendant, out of which grew not a real injury, but the semblance of an injury to the complainants. If the first neglect had not happened, the case of the complainants would have been just as it now is. If by that neglect they had obtained an unjust advantage over the defendant,

even. a *caveat*, or at least a suit in chancery, would have relieved him. Can they be injured by not obtaining, from this neglect, that which both law and justice would have taken from them? The defendant has in fact the eldest equity as well as the eldest patent.

3. The third ground of the defendant's equity is, that the complainants have gotten better land belonging, as they say, to the defendant, and, therefore, have suffered no injury : that they are bound by their acquiescence ; and that it would be unjust to make an exchange now, as it would deprive the defendant of his old patent, and, possibly, involve him in more litigation.

The following cases were cited in behalf of the original defendant, viz.

On the question upon the construction of the entries :

*Hughes's Rep.* 110. 124. *Kenny* v. *Whitledge. Hughes's Rep.* 14, 15. *Pawling* v. *Mereweather.* MS. *Johnson* v. *Naul.* MS. *Jones* v. *Craig. Hughes's Rep. Jackson & Owens* v. *Whitaker & Wife,* and *Ward* v. *Kenton & Fox.* MS. *Speed* v. *Lewis.* MS. *Drake* v. *Rumney. Hughes's Rep Ramsay & Logie* v. *Drake. Bryant* v. *Owens & Wallace. Sneed's Rep.* 9. *Wilson* v. *Speed. Id.* 396. *Frazier* v. *Steele.*

And upon the question of jurisdiction : *Hughes's Rep.* 2. 181. 1 *Wash.* 116. 2 *Wash.* 48.

*Argument for the original complainants.*

All the good lands in Kentucky are subject to at least two contending entries. In this case Taylor had the first entry, but Bodley had the first survey.

As to the question of jurisdiction, it has been long settled as a good ground of equity that the de-

fendant had obtained a legal title to which the plaintiff had a prior or better equity; and a court of law could not sustain an equitable against a legal title.

If the plaintiff shows an equitable title, the defendant must not only show his legal title, but he must support it by an equity equal at least to that of the plaintiff; for in equity the legal estate stands for nothing. *Sneed's Rep.* 43. 46, 47. *Quarles v. Brown. Consella v. Briscow. Swearingen v. Briscow.* 1 *Wash.* 230. *Hughes's Rep.* 53. *Fry v. Ezra. Id.* 88. 92. *Smith v. Evans, Id.* 110. *Greenup v. Coburn. Sneed's Rep.* 32. *South v. Bowles. Id.* 52. *Bradford v. Allen. Id.* 130. *Bruce v. ——*.

Taylor might have had a remedy by *caveat* if he would. But the remedy by caveat is only a concurrent remedy. It is not a remedy which can apply to all cases. A man may not know of a survey in time to enter his caveat.

The neglect of the process by caveat is no bar to relief in equity. *Harwood v. Gibbons,* MS. *Myers v. Speed, Hughes's Rep.* 97. *Kenton v. M'Connell, Hughes's Rep.* 140. *Picket v. Bib,* MS.

If the court has jurisdiction, the next question is, whether the complainants' entry is legal and sufficiently certain.

Two questions arise respecting every entry: 1. Is it sufficiently specific? 2. Is the same land surveyed which is described in the entry?

It is sufficiently specific if the land can be found by a reasonable search. At the time of the complainants' entry, nothing was more notorious in Kentucky than a *lick* and a *buffalo-road.* There is a difference where a distance is mentioned only to lead you to a part of the country where you will find a specific object which is described as the be-

ginning of a tract; and where the beginning is at the end of a particular line.

There must always be a general description, and a particular description.

It was not necessary that the marked trees should be notorious. You would be led to them by a reference to notorious objects, the blue licks, and the buffalo-*road. Greenup* v. *Coburn, Hughes's Rep.* 104. *Carter* v. ——, *Hughes's Rep.* 182. *Johnson* v. *Brown, Hughes's Rep.* 60. *Sneed's Rep.* 105.

If the complainants' entry be sufficiently certain, the next question is as to that of the defendant.

The defendant's entry depends upon John Walden's, which depends upon Ambrose Walden's, which depends upon Peter Johnson's. If Peter Johnson's be uncertain, the rest are uncertain.

Peter Johnson's 400 acres, being his settlement right, were to lie on the east side of the upper buffalo-road, and nine miles from the licks.

The beginning of the tract was to be nine miles from the lick, not the middle of the tract. The question then is, how is the survey to be made? Are you to follow the meanders of the road to ascertain the nine miles, or to take a point nine miles distant from the lick on a straight line? Are you to follow the road in running the lines of the survey? It would be impossible to be accurate as to the meanders of the road. The buffaloes make generally a number of paths not parallel to each other, sometimes approaching and again diverging, sometimes occupying a broad space which is all called the road; and they often meander so much, that after travelling nine miles you may not be a mile distant from the place of beginning. A distance upon a water-course is always measured in a straight line, without regard to the meanders of the

stream. So we say it ought to be understood when speaking of a buffalo-road.

The whole of Peter Johnson's 1,400 acres were to lie on the *east* side of the road; but the claimant below has placed part of it on the west side.

The proper mode of surveying Peter Johnson's claim is to begin at the end of nine miles upon a straight line, and so make the whole survey on the east side of the road in the form of a square, making the general course of the road the base line of the survey.

But Ambrose Walden's land could not be bounded by a mere right of pre-emption, which was undefined, unlocated, and might never be carried into effect. It was a mere possibility. There must be an entry of a pre-emption before it can be considered as located, and until it be located it cannot be surveyed. *Porter* v. *Gass, Sneed's Rep.* The case of *Kenny* v. *Whitledge* applies only to *village* rights. *Patrick* v. *Woods, Hughes's Rep. Sneed's Rep.* 330. 336. 270.

If it could not adjoin the pre-emption right, neither could it adjoin the *settlement right*, because the call was to join the 1,400 acre tract claimed by Peter Johnson, and not his 400 acre tract.

The defendant has lost his right to the land contained in his entry, by making his survey contrary to his location. When the survey is made, although erroneously, it is an execution of the warant, and puts an end to the entry as such. The warrant, as well as the entry, is *functus officio.*

In these cases a court of chancery does not act upon equitable principles only, but is merely to decide which party has the legal right to the patent. It is only a chancery form of deciding a legal right. The court cannot require the complainants to give up to the defendant the land which the de-

fendant might have surveyed under his entry, but which he failed to survey in proper time. It is not true in principle that the defendant is entitled to get his land somewhere; he did not purchase with that understanding. The state did not so contract.

When a man surveys contrary to his location he loses his equity. These are statutory rights, and therefore to be decided strictly according to the statute. An entry is a legal right; it descends to heirs; it is subject to execution; it may be sold and transferred. These points have all been decided by the courts of Kentucky.

*P. B. Key*, in reply.

There cannot be two valid entries of the same land at the same time.

When a first entry is forfeited the land is again waste and unappropriated; and not till then can a second entry of the same land be valid. A second entry made while the first was valid is void.

If Taylor's entry was valid, it gave a legal right, descendible, &c. The land was no longer waste and unappropriated or vacant. The entry of the complainants, while Taylor's entry was in force, was a nullity, and gave them no right either at law or in equity.

*February 27th*, 1807.

MARSHALL, Ch. J. The court has been able to form an opinion as to a part only of this case.

That the court as a court of chancery has jurisdiction of such cases, is a point established by a long course of practice in Virginia and in Kentucky; but in the exercise of that jurisdiction, it will proceed according to the principles of equity. In such case, a prior entry will be considered as notice to him

who has the legal title, if such entry be sufficiently certain. And the legal title will be considered as holden for him who has the prior equity.

BODLEY
v.
TAYLOR.

### March 14th, 1809.

MARSHALL, Ch. J. delivered the opinion of the court as follows:

This is an appeal from a decree of the court for the district of Kentucky, by which Taylor was directed to convey to Bodley and others a part of a tract of land to which he held an elder patent, but to which Bodley and others claim the better right under a junior patent. The judge of the district court having directed such part of the land held by Taylor to be conveyed to Bodley and others, as appeared by certain rules, which he has applied to the case, to be within their claim, and not within Taylor's location, and having dismissed their bill as to the residue, each party has appealed from his decree.

Previous to any discussion of the rights of the parties, it has become necessary to dispose of a preliminary question.

The defendant in the court below objects to the jurisdiction of a court of equity, and contends not only that the present case furnishes no ground of jurisdiction, upon general principles, but that the land law under which both titles originate, in giving a remedy by which rights under entries might be decided previous to the emanation of a patent, has prohibited an examination of the same question after a patent shall have issued.

Had this been a case of the first impression, some contrariety of opinion would perhaps have existed on this point. But it has been sufficiently shown that the practice of resorting to a court of chancery in order to set up an equitable against the legal title, received, in its origin, the sanction of the court of ap-

peals, while Kentucky remained a part of Virginia, and has been so confirmed by an uninterrupted series of decisions as to be incorporated into their system, and to be taken into view, in the consideration of every title to lands in that country. Such a principle cannot now be shaken.

But it is an inquiry of vast importance whether, in deciding claims of this description, a court of equity acts upon its known, established and general principles, or is merely substituted for a court of law, with power to decide questions respecting rights under the statute, as they existed previous to the consummation of those rights by patent.

It has been argued that the right acquired by an entry is a legal right, because it is given by a statute; that it is the statutory inception of a legal title which gives to the person making it a right, against every person not having a prior entry, to obtain a patent and to hold the land. The inference drawn from this is, that as the law affords no remedy against a person who has defeated this right by improperly obtaining a prior patent, a court of chancery, which can afford it, ought to consider itself as sitting in the character of a court of law, and ought to decide those questions as a court of law would decide them, if capable of looking beyond the patent.

This reasoning would perhaps be conclusive if a court of chancery was, by statute, substituted in the place of a court of law, with an express grant of jurisdiction in the case. But the jurisdiction exercised by a court of chancery is not granted by statute; it is assumed by itself: and what can justify that assumption but the opinion that cases of this description come within the sphere of its general action? In all cases in which a court of equity takes jurisdiction, it will exercise that jurisdiction upon its own principles. It is believed that no exception to this rule is to be found in the books, and the state of land titles in Kentucky is not believed to furnish one. The true ground of the jurisdic-

tion of a court of equity is, that an entry is considered as a record of which a subsequent locator may have notice, and therefore must be presumed to have it; consequently, although he may obtain the first patent, he is liable, in equity, to the rules which apply to a subsequent purchaser with notice of a prior equitable right. This certainly brings the validity of the entries before the court, but it also brings with that question every other which defeats the equity of the plaintiff.

The court, therefore, will entertain jurisdiction of the cause, but will exercise that jurisdiction in conformity with the settled principles of a court of chancery. It will afford a remedy which a court of law cannot afford, but since that remedy is not given by statute, it will be applied by this court as the principles of equity require its application.

Neither is the compact between Virginia and Kentucky considered as affecting this case.

If the same measure of justice be meted to the citizens of each state, if laws be neither made nor expounded for the purpose of depriving those who are protected by that compact, of their rights, no violation of that compact is perceived.

The court will proceed, then, to inquire into the rights of the parties, and, in making this inquiry, will pay great respect to all those principles which appear to be well established in the state in which the lands in controversy lie.

Taylor holding the eldest patent, it is necessary that the complainants below should found their title on a good entry. The validity of their entry, therefore, is the first subject of examination.

It was made on the 17th of October, 1783, and is in these words; " Henry Crutcher and John Tibbs enter 10,000 acres of land on a treasury warrant, beginning at a large black ash and small buckeye marked thus, I. T. on the side of a buffalo-

road leading from the lower blue licks a N. E. course, and about seven miles N. E. by E. from the said blue licks," &c.

The only objection to this entry is, that the beginning is uncertain.

Were the validity of this objection to be admitted, it would shake almost every title in Kentucky. If it be recollected that almost every acre of good land in that state was located at a time when only a few individuals, collected in scattered forts or villages, encroached on the rights of the savages and wild beasts of the country, that neither these sparse settlers, nor those hardy adventurers who travelled thither in quest of lands, could venture out to explore the country, without exposing their lives to imminent hazard, that many of those who had thus explored the country, and who made locations, were unlettered men, not only incapable of expounding the laws, but some of them incapable of reading, it is not wonderful that the courts of Kentucky should have relaxed, in some degree, the rigour of the rule requiring an impracticable precision in making entries, should have laid hold of every circumstance which might afford that certainty which the law has required, and should be content with that reasonable certainty which would enable a subsequent locator, by the exercise of a due degree of judgment and diligence, to locate his own lands on the adjacent residuum.

The entry of Crutcher and Tibbs possesses this reasonable certainty.

The blue licks was a place of general notoriety, and there appears to have been no difficulty in ascertaining the point from which the mensuration should commence. There being only one of the three roads leading from that point, which ran nearly a N. E. course, no subsequent locator could doubt on which road this land was placed. The entry having called for visible objects on the road about

seven miles from the licks, those visible objects might be discovered without any extraordinary exertion; and if they could not be discovered, then that call, according to the course of decisions in Kentucky, would be discarded, and about seven miles would be considered as seven miles. But those objects remained, and it appears that no difficulty has arisen, or ought to arise, on this point. The jury have found it to be the beginning called for in the entry.

The entry, therefore, of Crutcher and Tibbs is sufficiently certain, and the court will proceed to examine the entry and survey of Taylor.

This entry being the last link of a chain commencing with Jacob Johnson, it is necessary to fix Jacob Johnson, in order to ascertain the position of Taylor.

Jacob Johnson's title is a settlement and pre-emption; a certificate for which was granted by the commissioners, on the 7th day of January, 1780, in the following terms.

Peter Johnson, heir at law of Jacob Johnson, deceased, this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, lying on the east side of the buffalo-road leading from the blue licks to *Limestone*, nine miles from the lick on the upper road, by the said decedent's raising a crop of corn in the year 1776. Satisfactory proof being made to the court, they are of opinion that the said Peter Johnson, &c. has a right to a settlement of 400 acres of land to include the above location, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly.

On the 21st of February, 1780, this certificate, so far as respected the settlement of 400 acres, was entered with the surveyor.

It is the opinion of the court that the 400 acres

of land should lie entirely on the east side of the road, that it should begin at the distance of nine miles, and that those miles should be computed not by a straight line, but according to the meanders of the road.

In this respect the court perceives a clear distinction between a call for one place by its distance from another, if the intermediate space be entirely woods, or if a stream, which cannot well be followed, passes from the one to the other, and where a road is called for, which conducts individuals from point to point. The distance of places from each other is not generally computed by a stream not navigable, but is always computed by a road which is travelled. It is, therefore, the opinion of the court that where, as in this case, there is no other call in the entry showing a contrary intent, and the entry is placed on a road at a certain distance from a given point by which the road passes, the distance is to be computed by the meanders of the road, and not by a straight line.

The beginning of Johnson's settlement being found, and its western side being placed along the road, the next inquiry is, in what manner the land is to be surveyed.

In order to give certainty to locations of this description, the courts of Kentucky have uniformly determined that they shall be understood as being made in a square. Johnson's line upon the road, therefore, must extend along the road until two lines at right angles from each end of this base shall, with a third line parallel to the general course of the road, include, in a figure which, if the road be reduced to a straight line, would make a square, the quantity of 400 acres on the east side of the road.

The next link in this chain of entries, on which the title of Taylor depends, is Ambrose Walden's.

On the 22d of May, 1780, Ambrose Walden en-

tered 1,333 acres on the east side of Jacob Johnson's settlement and pre-emption, on the waters of Johnson's fork, a branch of licking, to include two cabins on the north side of said fork, built by Simon Butler, and to run eastwardly for quantity.

The cabins, it is said, cannot be found; or, if found, cannot be distinguished. The waters of Johnson's fork would be too vague, and, therefore, the validity of this entry must depend on the call for Johnson's settlement and pre-emption.

This is said to be insufficient, because the pre-emption had not, at that time, been located with the surveyor, and the certificate of the commissioners was no location. Johnson's pre-emption, therefore, had, on the 22d of May, 1780, no locality, a subsequent entry could not depend upon it; for it might be placed in any situation, or in any form, provided it be so placed as to adjoin his settlement in any point.

The argument with respect to the pre-emption appears to the court to be conclusive. This pre-emption right certainly had no locality on the 22d of May, 1780, and an entry made to depend entirely on it would have been too vague, too uncertain, to be maintained. But it does not follow that the entry of Ambrose Walden is void. He does not call singly for the pre-emption, he calls for " the east side of Johnson's settlement and pre-emption right;" and it seems to the court that a fair application of the principles which have governed in Kentucky in similar cases, will maintain this location.

The settlement was actually located; the pre-emption, at the time, had no other than a potential existence; and the uniform course of decisions appears to have been to discard one call which is either impossible or uncertain, and to support the entry, if there be other calls which are sufficiently certain. The decisions have gone so far as to dismiss a part of the description of a single call, if other terms of

description be sufficient to ascertain the thing called for. Now the call for the settlement right is valid and certain; and the court is not of opinion that this certainty is rendered uncertain by being united to the call for a pre-emption which had no real existence.

The call appears to be substantially the same as if it had been for the land of Johnson. His settlement and pre-emption was perhaps the name which, in common parlance, designated this land even before the location of the pre-emption, because it was appendant to the settlement. It has been decided that a call for the land would be good, and the court thinks that decision applicable to this case.

Against this has been urged the doubt which a subsequent locator would have entertained at the time, whether Johnson might not have been permitted to locate his pre-emption on any land adjoining his settlement, and whether Walden's entry calling for that pre-emption might be decided to be good, and to be placed so as to bind upon it. This doubt, it is said, though now removed, then existed, and would have operated on the mind of the subsequent locator.

The force of this argument will not be denied. But it must also be admitted that it applies with equal strength to the course of artificial reasoning which has governed the decisions of the courts of Kentucky, and on which the titles of the people of that country depend. Subsequent locators must have doubted in what manner any of these questions would be decided. But having been decided, the certainty which they have introduced is carried back to the time when the location was made, and affirms that location.

It has also been said that it is uncertain which side of Johnson's settlement is the east side, and that, in point of fact, the upper side, or that furthest

from the blue licks, faces the east more nearly than any other.

However this fact may be, the court is of opinion that the terms of Johnson's entry designate his east side. His settlement is to lie on the east side of the road. The road, then, in contemplation of the locator, forms the west side, and the side opposite the road must be the east side. The entry must have been so understood by all subsequent locators; and when they call for his east side, the intention to place themselves on the side opposite the road is sufficiently intelligible.

In this, as in other difficulties which occur in the course of the inquiry, it is material to observe that the bill does not charge Taylor's entry to be void for uncertainty. On the contrary it impliedly admits the certainty of his location, and charges that his survey does not conform to it. The real question, then, is not whether Taylor shall be surveyed at all, but where he shall be placed.

The entry of Ambrose Walden, then, will lie on the east side of Johnson's settlement, that is, on the side opposite the road; and, this point being established, the manner in which his land is to be surveyed is free from further doubt. It is to be laid off in a square, the centre of the base line of which is to be the centre of the south-eastern line of Johnson's settlement.

The next entry to be considered is that of John Walden. He enters 1,666 2-3 acres, joining Ambrose Walden, on the south and south-east, and to run east and south-east for quantity.

Although Ambrose Walden has no south side, yet it is sufficiently apparent that his south-west side was intended by the locator. The difficulty arises from the subsequent call of the entry to run east and south-east for quantity. A line drawn east from Ambrose Walden's south-western corner would pass

through the middle of his land, and a line drawn south-east from the same corner would pass either through or so near his land as to make it almost impossible to suppose that the locator could have intended to make so long and narrow a triangle. The reasonable partiality of Kentucky for rectangular figures must, therefore, decide the shape of John Walden's land, and regulate the manner in which this call of his entry is to be understood. Ambrose Walden's north-western line must be extended to the south, and a line must be drawn due east from his eastern corner, so that a line parallel to his south-eastern line intersecting a line drawn south-east from the extremity of the north-western line of Ambrose Walden continued shall lay off 1,666 2-3 acres of land in equal quantities on the northern and south-eastern sides of Ambrose.

It is not to be disguised that there is much difficulty in placing John Walden, but the court can perceive no mode of placing him more conformable to the principles which prevail in Kentucky than that which it has adopted.

We are now brought to Taylor's entry.

On the 22d of May, 1780, John Taylor enters 3,000 acres adjoining John Walden on the north side of Johnson's fork of licking, on the east and south-east side, running up and down said creek, and north for quantity, to include an improvement made by Jacob Drennon and Simon Butler.

There is to John Walden's land no east side, nor any side so nearly east as the south-east side. The word side, being in the singular number, and the same side answering, better than any other, both parts of the description, the land must lie on the south-east side.

It is also thought to be the more reasonable construction of the entry that the words, on the north side of Johnson's fork, refer to the situation of

6

John Walden's land, not to the location of Taylor's. But this is probably not important in the case. Taylor is to lie on the south-east of Walden, to include an improvement made by Drennon and Butler, to run up and down the creek, and north for quantity.

With these calls, it would have been the opinion of the court that Taylor could not cross the creek, had not his entry called for an object on the south side of the creek. That object is the improvement made by Jacob Drennon and Simon Butler.

It has been said that the country was covered with cabins, and that therefore this call was no designation of the land that was located. This argument is correct so far as it is urged to prove that this would not be sufficient, as a general description, to enable subsequent locators to say in what part of the country this entry was made. Neither would the letters I. T. marked on a tree answer this purpose. But, when brought into the neighbourhood by other parts of the description, these letters serve to ascertain the beginning of the entry under which the claim adversary to that of Taylor is supported. So Taylor informs subsequent locators of the neighbourhood in which his land lies, by calling for the south-east side of John Walden's entry, on the north of Johnson's fork, which is found by a reference to other entries which commence at a point of public notoriety. When brought to the south-east side of John Walden, he is near the cabin called for, and it does not appear that there was, in the neighbourhood, any other cabin which this entry could possibly be understood to include. This part of the description, then, will carry Taylor to the south side of Johnson's fork, and, if permitted to cross that fork, the favourite figure of the square must be resorted to. Against this it is said that, in such a case, the rule of Kentucky will carry him no further than barely to include the object of his call. But this rule cannot apply to this case, because it would give a survey the breadth of which would not be one third of its length.

It is impossible to look at the general plat returned in this case without feeling a conviction that the surveyor considered that fork which, in the plat, is termed mud lick fork, as Johnson's fork; and there is no testimony in the cause which shows that, when this location was made, that middle stream which runs through Taylor's survey was denominated Johnson's fork. The finding of the jury, however, that the roads and water-courses are rightly laid down, must induce the opinion that this fact was proved to them.

In a case where the mistake is so obvious, the rule which, under circumstances so doubtful, relative to place, deprives the person, in surveying whose property the mistake has been made, of his legal title, appears to be a severe rule to be adopted in a court of equity. But such is the situation of land titles in Kentucky, that the rule must be inflexible.

Taylor, then, must adjoin John Walden on his south-east side, where that line crosses Johnson's fork, if it does cross it, and if it does not, then at its south-eastern extremity, which will be nearest Johnson's fork. If a square formed upon the whole line shall contain less than three thousand acres, then two lines are to be extended due north until, with a line running east and west, the quantity of three thousand acres shall be contained in the whole figure. If such a square shall contain more than three thousand acres, then it is to be laid off on so much of Walden's line as to contain the exact quantity.

This being the manner in which it appears to the court that Taylor's entry ought to be surveyed, it remains to inquire whether, under the principles which govern a court of equity in affording its aid to an equitable against a legal title, the complainants below ought to recover any; and, if any, what part of the lands surveyed by Taylor, and, if any, what terms are to be imposed upon them.

The entry as well as patent of Taylor is prior to that under which the complainants in the district court assert their title. Of the entries made within their location, therefore, they had that implied notice which gives a court of equity jurisdiction of this cause. They cannot object to the operation of a principle which enables them to come into court. But, in addition to this principle, they must be considered as having notice, in fact, of these locations. The position of the entries of both plaintiffs and defendant is ascertained by calling for certain distances along the same road from the same object. Crutcher and Tibbs, therefore, when they made their location, knew well that they included the Waldens and Taylor, and that their entry could give them no pretensions to the lands previously entered by those persons. If, by any inadvertence, the Waldens and Taylor have surveyed land to which Crutcher and Tibbs were entitled, and have left to Crutcher and Tibbs land to which the Waldens and Taylor were entitled, it would seem to the court to furnish no equity to Crutcher and Tibbs against the legal title which is held by their adversaries, unless they will submit to the condition of restoring the lands they have gained by the inadvertence of which they complain.

The court does not liken this inadvertent survey of lands, not within the location, to withdrawing of the warrant and re-entering it in another place. The latter is the act of the mind intentionally abandoning an entry once made: the former is no act of the mind, and so far from evidencing an intention to abandon, discovers an intention to adhere to the appropriation once made. Although their legal effect may be the same, yet they are not the same with a person who has gained by the inadvertence, and applies to a court of equity to increase that gain.

Was this, then, a case of the first impression, the court would strongly incline to the opinion

BODLEY
v.
TAYLOR.

Bodley
v.
Taylor.

that Bodley and Hughes ought not to receive a conveyance for the lands within Taylor's survey, and not within his entry, but on the condition of their consenting to convey to him the lands they hold which were within his entry and are not included in his survey. But this is not a case of the first impression. The court is compelled to believe that the principle is really settled in a manner different from that which this court would deem correct. It is impossible to say how many titles might be shaken by shaking the principle. The very extraordinary state of land title in that country has compelled its judges, in a series of decisions, to rear up an artificial pile from which no piece can be taken, by hands not intimately acquainted with the building, without endangering the structure, and producing a mischief to those holding under it, the extent of which may not be perceived. The rule as adopted must be pursued.

Taylor, then, must be surveyed according to the principles laid down in this decree, and must convey to the plaintiffs below the lands lying within his patent and theirs, which were not within his entry.