THE PEOPLE of the STATE of NORTH CAROLINA, upon the relation of ADRIAN H. VAN BOKKELEN and others *v.* WILLIAM P. CANADAY and others.

Cities and towns, like counties and townships, are parts and parcels of the State, organized for the convenience of local self-government; and the qualifications of voters are the same, to wit, citizenship, twenty-one years of age, twelve months residence in the State, and thirty days in the city or town.

The General Assembly cannot in any way change the qualifications of voters in State, county, township, city or town elections. *Hence,* so much of the act amending the charter of the city of Wilmington, ratified on the 3d day of February, 1875, as requires a residence of ninety days instead of thirty, is unconstitutional and consequently void.

The 8th section of the act amending the charter of the city of Wilmington, ratified the 3d day of February, 1875, providing for the registration of voters, directs that the different wards of the city should be divided into precincts; in this division, a large portion of the third ward is not included in any precinct, and cannot register or vote: *Held,* that the election had under said act, on the second Thursday of March, 1875, was therefore void.

So much of said Act as requires a voter, when challenged, to prove by other persons of credibility, known to them, that the voter is of lawful age, has resided twelve months in the State and ninety days in the lot, in the block and in the ward specified in the registration book, is a practical denial of the right to register and vote, and is void.

So much of said act as gives to each of the first and second wards, with 400 voters each, a representative of three aldermen, and to the third ward with 2,800 votes, also a like representative of three aldermen, violates the fundamental principles of our Constitution, and is void.

(The cases of *Perry* v. *Whitaker,* 71 N. C. Rep. 475, and *Jacobs* v. *Smallwood,* 63 N. C. Rep. 112, cited and approved.)

CASE AGREED, tried before *Kerr, J.,* at Spring Term, 1875, NEW HANOVER Superior Court.

The case was submitted for the decision of the Court upon the follow facts agreed:

That on the first Monday in May, A. D. 1873, under the act of the General Assembly, ratified the 20th day of Decem-

ber, A. D. 1870, entitled " An Act Concerning the City of Wilmington," Alrich Adrian, S. H. Fishblate, Roger Moore, Jacob Wise, and the defendants W. P. Canaday, L. E. Rice, Duncan Holmes, W. H. Banks, Hiram Hawkins and Henry Brewington were duly elected Aldermen of the City of Wilmington, and immediately thereafter entered upon the duties of the said office. On the 15th day of July, 1873, Jacob Wise resigned his said office and Isaac B. Grainger was elected by the Board of Aldermen to fill the vacancy. On the 2d day of October, 1874, the said Grainger resigned his office, and John W. Atkinson was elected to fill the vacancy. On the 10th day of March, 1875, the said Alrich Adrian, S. H. Fishblate, Roger Moore and John W. Atkinson all resigned their offices, and the other defendants, Jesse J. Cassiday, Joseph H. Neff, Thomas M. Gardner and Benjamin G. Bates were, by the said Board elected to fill the vacancies caused by the resignation of the parties aforesaid, and immediately entered upon the duties of their offices.

By an act of the General Assembly, ratified the 3rd day of November, A. D. 1873, entitled " An Act relating to the City of Wilmington," it was directed that the election for aldermen of said city should be held " biennially on the days which now are, or hereafter may be, appointed by law for the election of the Board of Trustees for the township of said city. It was further provided by said act, " that the persons who may be in office as Mayor and Aldermen of said city on ___ first day of May next, (that is to say, on the 1st      M.., 874,) shall continue in office until their successors shall be elected, at the next regular election as herein provided, and until such successors shall be duly qualified.      *

At the time of the ratification of the said act, the next regular election for the Board of Trustees for the township of said city was appointed by law to be held on the first Thursday in August, 1875.

By an act of the General Assembly ratified the 3rd day of February, A. D. 1875, entitled " an act to amend the charter

of the city of Wilmington," it was enacted that the said city should be divided into three wards therein described and bounded, that the corporate powers granted to the city should be exercised by a Board of Aldermen to consist of nine members, three to be elected by each ward, and that an election for nine Aldermen of said city should be held on the second Thursday in March, 1875. The Aldermen elected at the first election held under the said act "shall enter upon the discharge of their duties, when the term of office of the present Board of Aldermen shall expire by operation of law, and shall hold their offices until the first Thursday in April, 1877.

An election was duly held according to the terms and provisions of said act, at which election the relators, A. H. Van Bokkelen, F. W. Kerchner and W. L. DeRosset, in the first ward, W. L. Smith, L. H. Bowden and S. W. Vick in the second ward, and J. D. Love, T. W. Player and W. D. Mahn in the third ward, received a majority of all the votes cast ; all the provisions of the said act were duly complied with, and the judges of election for the several wards publicly proclaimed the result of the voting, and certified in writing according to the provisions of the said act that they were duly elected Aldermen of the said city for the several wards as aforesaid, and filed copies of the said certificates with the Clerk of the city, and published the same in the newspapers of the city as required by the provisions of the act.

The Aldermen above named duly qualified by taking and subscribing before a Justice of the Peace, for the county of New Hanover the oath prescribed in the said act, and since the said election and qualification of the relators, the defendants have continued to exercise the duties of the said office, and have withheld and continue to withhold from the relators the said offices of Aldermen of the city.

All the acts of the General Assembly hereinbefore referred to, are declared to be a part of this case for all intents and purposes, as if they were herein fully set forth.

The whole number of male persons, citizens of the United

States, twenty-one years old or upwards, being inhabitants of said city, as estimated upon the basis of past elections is about thirty-six hundred, of whom about twenty-two hundred are colored, and the remainder white. The number of such persons in the first ward, is about three hundred and ninety-seven, of whom about two hundred and ninety-one are white, and the remainder colored.

The number of such persons in the second ward is about three hundred and sixty, of whom about two hundred and eighty-one are white and the remainder colored. The whole number of such persons in the third ward is about twenty-eight hundred, of whom about eight hundred are white and the remainder colored.

The assessed valuation of the real estate of the city of Wil. mington as to the several wards is as follows, to wit: In the first ward $950,000, in the second $1,180,000 and in the third about $2,000,000.

At the election held on the 11th day of March, 1875, votes were cast as follows: In the first ward the whole number of votes cast was one hundred and sixty, in the second ward the whole number of votes cast was one hundred and ninety-three, in the third ward the whole number of votes cast was three hundred. The defendants did not participate in said election nor recognize its validity, but on the contrary they, or a part of them, advised and counseled the people not to recognize the election.

That portion of the territory within the corporate limits, designated on the map as third ward, west side of the river, is not embraced in any of the registration precincts provided for in the act of Feb. 3rd, 1875, but is included in the third ward, as set out in said act.

Prior to the meeting of the last General Assembly notice was given for thirty days by publication in the " Daily Journal," a newspaper published in the city of Wilmington, and which circulates in the county of New Hanover. The following was the form of said notice, to-wit:

"Application will be made to the next General Assembly of North Carolina to amend the charter of the city of Wilmington, and for other purposes."

A considerable portion of the third ward consists of unimproved and uninhabited lots, on the outskirts of the city.

Upon the foregoing facts it is submitted to the Court to determine the following questions:

1. Whether the relators of the plaintiff are now entitled to the said offices of aldermen of the said city.

2. If not entitled now will they be so entitled from and after the first Thursday in August next, being the day appointed by law for holding the next election for the Board of Trustees for the township of said city.

And it is agreed that if the Court shall be of opinion in the affirmative upon either of the said two questions, judgment shall be rendered that the defendants be ousted from the said offices and that the relators be put in possession thereof.

His Honor gave judgment in favor of the relators of the plaintiff, that the defendants be ousted from the possession of said offices and the relators be put in possession, &c. From this judgment the defendants appealed.

*Russell, Shipp & Bailey, Fowle, Badger* and *Haughton,* for appellants, submitted.

CAN THE LEGISLATURE CHANGE THE CONSTITUTIONAL ELECTORAL QUALIFICATION?

That the General Assembly has no such power is so manifest that it is surprising that the question should ever have been raised. Yet authorities are abundant.

*Rison* v. *Farr,* 24th Ark., 161; *Wisconsin* v. *Williams,* 5th Wisconsin, 308; *St. Joseph & D. C. R. R. Co.* v. *Buchanan county,* 89th Missouri, 585; *Davies* v *McKerby,* 5th Nevada, 169; *McClafferty* v. *Guyer,* 59th Penn., 109; *Page* v. *Allen,* 58th Penn., St. R., 338, 347; *Thomas* v. *Ewing,* 1st Brewst. 103. But the question is, has the Assembly under-

taken to change the constitutional qualification ?   This carries us to the question :

DOES THE POWER TO SELECT MUNICIPAL OFFICERS RESIDE IN THE VOTERS OF THE CORPORATION QUALIFIED ACCORDING TO ARTICLE VI, SECTION 1 ?

The power of appointments by art. 3, sec. 10, is expressly prohibited to the General Assembly.   The General Assembly cannot exercise this power in any case or in any shape, whether the office be created by the Constitution or by statute.   *Clark* v. *Stanly,* 66 N. C.

Says READE, Judge, in *People ex rel Nichols et al.* v. *McKee et al.,* " reading the whole Constitution, and without any hyper-criticism, it is plain, that such officers as are not elected by the people at the polls—and most of them are so elected—are to be appointed by the Governor, except the immediate officers of each branch of the Legislature and the immediate officers of the Supreme Court."

According to the settled doctrines established in this line of cases, *Clark* v. *Stanly,* 66 N. C.; *People ex. rel. Nichols* v. *McKee,* 68 N. C.; *People ex. rel. Walker* v. *Bledsoe,* 68 N. C.; *People ex rel. Badger* v. *Johnson,* 68 N. C.; *People ex. rel. Rogers* v. *McGowan,* 68 N. C.; *North Carolina ex. rel. Howerton* v. *Tate,* 68 N. C., the power is in the Governor, or in the people.   Either view is sufficient for the defendants in this action.

The Legislature cannot do by indirection what they cannot do directly.   They cannot *delegate* the power of appointment. But it will not be denied that if they can change the constitutional qualification, as this act does, there is no limit to their discretion or their will.   They may establish woman suffrage, educational qualification, elect a class of persons to whom they commit the power of electing officers or select the officers themselves.   All this must be conceded to the Legislative power if the claim of plaintiffs is admitted.   There is no mid-

dle ground. The power is in the Governor, the Legislature or the people. Plaintiffs' case can be sustained on no principle save the absolute sovereignty of the Legislature over municipal corporations, and the absence of all organic restraints ex_pressed or implied upon its supreme will. And this power is sought to be derived by invoking the well settled principle that, the power to create involves the power to destroy, and that municipal corporations being the creature of the Legislature are, in general, subject to its authority. This is not de_nied. But we submit that our Constitution restricts this gen_eral power in the matter of selecting municipal officers; and that is the question to be decided. The power of Legislative appointment is sought to be derived from Art. 8, Sec. 4: "The Legislature shall provide for the organization of cities and towns." Does this grant of power carry with it authority to reverse the whole order of things as established by the Constitution, to make the Legislature the depository of the appointing power against the general policy and express inhibitions of the instrument, and to deprive the people of cities and towns of local self-government? Or does it mean simply what it says, that the Legislature shall *organize* cities, that is perform the ordinary and necessary acts of the legislation, create the offices, fix the salaries, prescribe the duties of officers, lay off the city into proper divisions, and generally to prescribe rules and regulations for the municipal government? Mark the connection: "The Legislature shall provide," &c., *and* "restrict the power of taxation, assessments, borrowing money, contracting debts and loaning their credits"—showing that the idea of the draftsman was to provide for the *establishment, creation and supervision* of these local governments without ever supposing that he was interfering with the other parts of the Constitution which fix the appointment of officers, or by irresistible implication leave their election to the reserved rights of the people. This is precisely analogous to the point decided in *People ex. rel. Welker* v. *Bledsoe*, 68 N. C. There the argument was made that, as the Constitution conferred

THE PEOPLE of N. C. *ex rel.* VAN BOKKELEN *et al. v.* CANADAY *el al.*

power on the Legislature to provide for the "*conduct*" of State's prison, this carried the power of appointing directors of the prison. The contrary was held by this Court. The Court stated the distinction as above.

But it is objected that the suffrage clause, Art. VI., sec. 1, applies only to State and county elections. This objection is plainly answered by the Constitution itself. That this clause establishes a general and universal electoral qualification, applying to townships, to towns, cities, villages and other municipal divisions less than a county, is conclusively shown by sec. 5 and by sec. 7 of Art. VII. Of course the *residence* qualification, when the election is for a township or city, applies only to actual residents in the township or city. The qualified voters of the county cannot vote in the city election any more than they can go into a township, outside of their own, and vote at a township election. Whether the thirty days in the county can be construed to require the same length of domicil in the township or city, or whether the residence in the State and county for the twelve and one months respectively, and actual residence in the township or city on the day of election constitute a full suffrage qualification, it is not material here to inquire. Will it be said that the "qualified voters" in sec. 7, Art. VII, mean such persons as the *Legislature may declare* to be qualified? If so, then the section furnishes no guarantee against the evils to remedy which it was intended; because it will only be for the Legislature to exclude those who are opposed to contracting the debt and leave it to be voted on by its promoters and advocates! But the same claim may be set up with the same propriety in reference to the township clause, sec. 5, Art. VII. Yet who doubts that the "qualified voters" thus mentioned refer directly to the suffrage clause, sec. 1, Art. VI? Some things are too plain to be argued.

DOES THE UNCONSTITUTIONALTIY OF THE ACT VITIATE THE ELECTION?

The rule is well settled that mere irregularities in the poll

occasioned by failure of election Judges to observe the directory clauses of the statute, do not affect the validity of the election.

It is equally conceded that the reception of illegal votes or rejection of qualified votes does not *per se* vitiate the poll. To have this effect it is ordinarily necessary that it should appear that such unlawful votes received or such lawful votes rejected would have changed the result.  But when upon a canvass of the whole return the Court sees that lawful votes have been rejected or unlawful votes received to such an extent as to throw a cloud over the result and to make an accurate canvass impossible, the poll must be set aside.

In the language of Judge THOMPSON in *Thompson* v. *Ewing*, 1 Brewst., 107, " when the conduct of election of officers (though actual fraud be not apparent) amounts to such gross and culpable negligence, such a disregard of their official duties as to render their doings unintelligible or unworthy of credence and the result of their action unreliable"—in all such cases the election is void:  It was said in *People* v. *Cook*, 8 N. Y., 69, should the ballots be partially destroyed or the boxes be partly crammed so as to render it impossible to ascertain the number of genuine ballots, *the whole should be rejected.* So in the leading case of the Scranton Borough election, *Bright. Lead. Cases,* 455, it is said : " If it appear that an erroneous rule was adopted which did improperly keep legal voters from voting or which prevented legal voters from offering their votes, it would be an undue election—more clearly, however, *to be set aside by the Court* if, under the evidence, it be reasonably probable that if such votes had been received the result would have been different or *have been left in doubt."*

All the authorities seem to agree that if the irregularity is such that the errors cannot be accurately corrected, or such as to cast the result into doubt and confusion, the poll must be vacated. *Littlefield* v. *Green*, Brightley, 493 ; *Mann* v. *Cassidey*, 1 Brewst., 60 ; *Weaver* v. *Green*, Ibid, 140 ; *Battery* v. *Megany*, Ibid, 162 ; *Gibbons* v. *Sheppard*, 2 Brewst., 1 ; *Harper* v. *Greenbank*, 1 Brewst., 189.  This principle is re-

cognized and assumed in *Platt* v. *People*, 29 Ill., 72. Now is our case one where the rejection casts the result in doubt and confusion? And does it appear that such rejection in all reasonable probability changed the result?

Look at the facts here: In the 1st Ward, out of 397 voters, Relators received *a majority* of the 160 votes cast; in the 2d Ward, out of 360 voters, Relators received *a majority* of the 193 votes cast; in the 3d Ward, out of 2,800 voters, Relators received *a majority* of the 300 votes cast. Out of 3,600 voters, 653 votes were cast. Where were the other 2,937 qualified voters? True the case shows that a part of the Respondents ignored the election and advised against it; but who can say how many qualified electors had come into the city in the preceding 90 days? Who can say how many had moved from one ward to another? Who can say how many had moved from one block to another? Who can say how many had not resided continuously in one lot or yard? The case shows that a large part of these people were colored, and all of them were inhabitants of a commercial city—the former just rescued from slavery and transitory in their habits—all of both races subject to the mutations of life incident to residence among a commercial population. These things the Court will take notice of judicially. Does it require any stretch of the imagination to see that enough were thus unlawfully disqualified to have changed the result? How many would it have taken to change the result the case does not show—it only states that relators received *a majority* of the votes cast, which (that is, the number of votes cast,) is in the First and Third Wards, less than a majority of the votes in each ward. If relators were elected by a bare majority, then, of course, one or two votes in each ward would have changed the result. Even supposing that relators received all the votes cast—a most violent and unreasonable presumption—it is easy to see that a proscription like this, applying to large classes of citizens, whose number no man knows or can ascertain, could, and most reasonably did, change result. Take, for example, the Third Ward: Out of

2,800 voters only 300 voted. Who can say that there were not 300 others disfranchised? So that when upon the settled principles apply to lawful and regular elections, this one was invalid.

But no such rules can apply to a case like ours. In case the irregularity is not an incident to a lawful election, but the election is based upon and owes its very existence to the unlawful element. Ours is a case where the Constitution having established the electoral body, the Legislature undertakes to *change* it, and proceeding on an assumption of its power to do, ordains another and a different body, excluding a part contrary to the Constitution.

Suppose the act had excluded all white men and declared that only colored persons should be entitled to register and vote. Would the Court wait to enquire whether there were enough whites to have changed the result? And would it be said that these whites should have tendered their votes and have had witnesses to prove it? Is there no difference between an improper exclusion of voters in a lawful election conducted on lawful principles and a systematic, collosal proscription of lawful electors proceeding from the mandate of the act to which the election owes its existence?

An election begun and held with the avowed purpose of taking the sense of a *part* only of the electoral body—with full notice to the rest that they are to be ignored. Does it stand on the same ground with a legitimate and regular election in all respects unexceptionable save that by mistake or fraud a stated number of persons were improperly rejected? Take an example: Our Constitution, Art. VII, Sec. 7, provides " that no city shall contract a debt unless by a vote of a majority of the qualified voters therein." Suppose the Legislature should order an election under this clause and direct that the question should be submitted to the that part of the electors residing on the west side of the river, while those on the east side shall not vote! Would it be gravely contended that this election is good unless the disfranchised voters tendered

their votes somewhere and to somebody and then established by proof that there were enough of them so offering to vote, and that they would have voted in such a way as to have changed the result ? Would any Court hesitate to say, the law itself being in its very terms unconstitutional and void, conferred no power upon the poll holders and to declare the election a nullity ? Suppose the Legislature should provide that the electors of Brunswick should elect a sheriff for New Hanover or that the electors of Wilmington township should elect Commissioners for the county of New Hanover ? If the position contended for by the relators be the true one, then these elections could not be assailed unless the disfranchised voters tendered, were rejected and then proved that their votes would have changed the result ! *Reductio ad absurdum.*

Innumerable cases may be supposed as showing the fallacy of applying the ordinary rules of counting and canvassing returns—rules adopted for the purpose of correcting the errors and frauds of election judges without affecting the legal votes actually cast—to an election held upon a *foundation of illegality, created by an unconstitutional law, and operating upon a part only of the electoral body.* Suppose the Legislature should change the Constitutional qualification, so that only the men over 50 years, and all the women and female children should vote, and under such an act an election is held. According to the position maintained by the other side, this election would be good until it was made to appear that the qualified voters under 50 years offering to vote, being added, and the female voters being substracted, the result would have been changed. After this, illustration is fruitless.

When an erroneous rule is adopted by the election judges, operating to exclude a class of qualified voters, they are not required to go through the vain and empty form of tendering their votes. *Scranton cases, ante.* But here the voter who tendered his vote, not having the qualifications prescribed, was subject to indictment. The act of 20th December, 1870, sec. 4, in the matter of the penalty denounced against any one

14

" offering to register, not being entitled," is not repealed by, because not inconsistent with, the act of 1875. So that all these disfranchised voters would have been exposed to criminal pains and penalties had they offered their votes. True, it may well be said that, as to lawful electors, the penalty was void. But every man is not a Constitutional lawyer ; and what better is calculated to deter a citizen from the exercise of his rights than a criminal penalty denounced against the attempt ? Is the citizen to run the gauntlet of a criminal prosecution in order to put himself in a position where he can assert his rights ?

In this case, besides the exclusion by reason of the unconstitutional tests imposed, it is to be observed that a large part of the voters resident therein, are excluded from all rights to register or vote . Twenty-five blocks—an area as great as of the first or second ward—are totally shut out from all participation in the election. The number of qualified voters thus disfranchised, the case does not state. If we are to surmise from what does appear in the case stated—and this is the only way of estimating the number—it would appear that some three hundred or three hundred and fifty electors are thus excluded. This excluded territory is larger than the second ward and but one block smaller than the first ward. They contain, the former three hundred and sixty and the latter three hundred and ninety-seven voters. Where should these electors have offered to vote ? No place was provided. They were absolutely and entirely excluded. This of itself takes this case out of the ordinary rules and doctrines applying to elections, and establishes that this was 'in no sense an election by the qualified voters of the city, but simply an attempt to delegate to certain favored individuals the power of selecting municipal officers. To show the effect of legalizing this exclusion by running out the principle to its natural and inevitable results, would be superfluous. To the suggestion that the act does not exclude these twenty-five blocks, we answer that the act plainly divides the third ward into four precincts and ex-

pressly prescribes their boundaries. Why name the lines and boundaries of these precincts, if not for the purpose of embracing the voters within the boundaries? True, in other sections reference is made only to the block, the lot and the ward. To have inserted in every place after the word "ward," when used in connection with the act of registering or voting the words: "and (if such voter resides in the third ward) in the precinct in which he offers to vote"—would have been more explicit, but it was not necessary. The act must be construed together so as to make all of it stand. To say that a voter living in the fourth precinct could vote at the other end of the city in the first precinct, is to make nonsense of the section which prescribes the boundaries of the precincts.

In *People* v. *Hastings*, 29 Cal. 449, it is held that as the Constitution provides that the assessors should be elected by the qualified voters of the town in which the property is situated, an assessor elected by a district embracing a more extended area than the town had no authority, and the tax itself was void. So grossly unlawful did the Court seem to regard this sort of an election that they disregarded the officer's title even in a collateral proceeding. *A fortiori* is it a nullity when the constitutional division is split and the election given to a fraction of the electoral body.

This identical question is settled by a well considered opinion of this Court. *Perry* v. *Whitaker*, 71 N. C. Rep. That case is "on all fours" with ours as to the effect upon the election of excluding a class of voters from the rights of the ballot.

SUPPLEMENTARY BRIEF.

*People* v. *Hulbert*, 24 Mich.; Const. of Michigan, Art. 15, sec. 14, provides: "Judicial officers of cities and villages shall be elected, and all other such officers shall be elected or appointed at such time and in such manner as the Legislature may direct." Art. 15, sec. 13, is the same as the clause in our Const. Art. 8. sec. 6: "Legislature shall provide for the

*incorporation* (this word in our Constitution is omitted) and organization of cities and villages and shall restrict," &c. Ours was evidently copied from that.

Constitution of Michigan contained no express inhibition on Legislative appointments nor any " reserved rights " clause as does ours.   Legislature of Michigan, by an act amending the charter of Detroit, appointed certain persons to fill the municipal offices.   The Supreme Court of Michigan decides that the act is void because contrary to the *spirit*, and *meaning*, and *scope*, and *policy*, of the Constitution.

The opinions of Chief Justice Campbell and Judge Cooly assert broadly the right of local self-government in the corporators of cities and villages, and deny that anything but *an express grant of Legislative power* can take it away.

The power to control the selection of municipal officers as conferred by the authority to " organize" was not claimed by counsel on the argument, nor was it deemed worthy of notice by the Court.

When a Constitutional provision is borrowed from a sister State, the construction given to it by the judiciary of such State is high authority as to its meaning.  *Langdon* v. *Applegate*, 5, Ind. 327.

So has the Supreme Court of the United States held that the construction given by the State judiciary to their own Constitution is binding on the Federal Courts.   5 Cranch, 222 ; 9 Cranch, 87; 12 Wheat, 153, 166 ; 5 Pet. 151 ; 7 How. 767; 2 Cush., 189 ; 4McLean, 488 ; 1 Black 436.

" *Optimus interpres rerum usus.*"   Cool. Const. Lim 35. The Constitution must be construed according to the *thoughts which it expresses* which must be arrived at not only in the light of its language, but also its history, its policy and the condition of and political usages of the State.   Legislation which contravenes them is void.  *Marbury* v. *Madison*, 1 Cranch 137.  *Gibbons* v. *Ogden*, 9 Wheat., 188.  *Newell* v. *People*, 7 N. Y., 97.   1 Doug., Mich., 354.   2 Mich., 587.   5 Mich., 53.   7 Mich. 345.   11 Mich., 120 and

139.  *State* v. *Underwood,* 63 N. C. Rep.   *Maize* v. *State,* 4 Ind., 342.

The general scope and purport of the Constitution is to make all officers elective by the electors of the locality comprised in the election District.   The elective franchise, whether derived from the Constitution or an inherent right reserved to the people in so far as not restricted by the Constitution in express terms, cannot be interfered with by the Legislature beyond merely regulating the formal details of its practical exercise.

Art. XIV, sec. 5, of the Constitution supports the view taken by this Court in the numerous cases here cited as fixing the power of Gubernatorial appointment or popular election. Here the Constitution divides the "offices in this State" into two classes, recognizing no others, to-wit : Those appointed by the Governor and those elected by the people.

Sec. 16, Art. II, of the Constitution recognizes counties, cities and towns as political entities in the political divisions of the State.

The Ordinances of the Convention of 1868 amending the charter of Wilmington and Raleigh conclusively show that the framers of the Constitution thought the suffrage clause, Art. VI, sec. I, applied to cities and towns.   These give us a cotemporaneous construction placed upon the Constitution by the body which formed it, and the people ratified it with notice of this construction.

### THE ELECTION WAS VOID.

In the case of *Fort Dodge City School District* v. *the District Township of Wakansa,* 17, Iowa 85, it was distinctly held by the Supreme Court of Iowa—a high authority—in an opinion delivered by Chief Justice WRIGHT and concurred in by Judge DILLON, one of the most profound and accomplished lawyers in America—that, when the notice of an election, instead of providing for taking the vote of all qualified elec-

tors, provided for a vote by only a portion thereof, *the election was void, although the votes thus excluded were not enough to have affected the result.* The reasoning of the Court is pointed, forcible and conclusive.

*People* v. *Maynard* 15, Michigan 463. The Legislature attempted to lay off a new county, but so arranged the voting precincts, &c., so as to exclude a part of the electors: *Held*, the act was void and no county was established.

*Lanning* v. *Carpenter.* 20 N. Y. 447. The Legislature attempted to lay off a new county comprising parts of two Senatorial Districts, so that the people of the new county could not vote in either District : *Held*, the act was void.

*Attorney General* v. *Supervisors of St. Clair*, 11, Michigan 63. The Legislature submitted to the vote of the people the question of moving the county seat, but so arranged the voting places as not to give the electors in a certain locality a chance to vote at all : *Held*, the act was void—*without regard to the number of voters excluded, or whether their votes could have changed the result.*

*Kinney* v. *City of Syracuse*, 30, Barbour 364. A part of Syracuse was incorporated in the town of Dewitt, but not attached to any election precinct in the latter town, so that the electors of this detached section could not vote in Syracuse because they were no longer residents, and they could not vote in Dewitt because not attached to any precinct: *Held*, to be a fatal objection to the validity of the act, which was declared void. The same principle by implication is decided in *Ramsay* v. *People*, 19 N. Y. 41.

The case of the *State of Wiscon. ex. rel. Knowlton* v. *Williams*, 5 Wis. 308, settles this question so far as authority can settle anything. The residence qualification in the Constitution of Wisconsin is *twelve months in the State.* The Legislature ordered an election to be submitted to the " qualified electors of the county of LaFayette " with a provision that " no person shall be deemed qualified to vote *unless he shall have resided in the town where he offers his vote at least thirty*

*days previous to the election* : · *Held,* That the Legislature might provide that electors should · vote only in the town where they reside because this would only be to prescribe manner and place, where and how the rights should be exercised ; but to add a residence qualification not mentioned in the Constitution is a violation of that instrument. The act authorizing the election being in this respect unconstitutional, *the election is void.* " The question is whether the legal voters have had an opportunity to express their wishes. If the act had submitted the question to the legal voters of the county, then a most material question of fact might have arisen in regard to the qualifications of those whose votes were refused by the inspectors of election. But the act in question, in express terms, prohibited persons from voting although they had all the qualifications which the Constitution requires. They, *therefore,* were not allowed by the act to vote, and if they had offered to do so their votes would have been rejected. It follows that the *legal voters* of the county had no opportunity to vote." And the court says in positive words, that it makes no sort of difference whether they tendered their votes or whether their votes might have changed the result.

To the same effect and affirming the same principle is *Denver City R. R. Co.* v. *Buchanan,* 39, Missouri 485. The Constitution of Missouri fixes a general electoral qualification as does ours. The Legislature in submitting the question of subscribing to stock in a Railroad required the voter to be a tax-payer: *Held,* That the attempt to depart from the constitutional qualification vitiated the act and rendered the election void.

*Page* v. *Allen,* 58 Pen. St. R. 338, 347. The expression of one thing in the Constitution is the exclusion of things not expressed. Lord Bacon's remark that " as exceptions weaken the force of a general law, so enumeration weakens as to things not enumerated," expresses a principle of common law applicable to the Constitution which is always to be understood in its plain, untechnical sense. In electors is vested a

high, and to freemen a sacred right of which they cannot be divested by any but the power which established it. The Legislature must prescribe necessary regulations as to the plans made, manner and whatever else may be required to insure its full and free exercise. But these regulations must be subor_ dinate to the right the exercise of which is regulated. The right must not be impaired by the regulation. It must be regulation purely, not destructive. "As a corrallary to this, no constitutional qualification of an elector can in the least be abridged, added to, or altered by legislation or the pretense of legislation." No regulation can be valid which will have the effect to increase the residence as fixed by the Constitution.

"A law intended to take away or unnecessarily postpone or embarrass the right of an elector will be set aside as unconstitutional." The Constitution of Pennsylvania required ten days residence previous to the election. The registry act required registration to be ten days before the election and allowed only those to register who had resided ten days—thus making the residence twenty instead of ten days : *Held*, The act to be void for this reason.

*Bill of Rights*, sec. 10. How can an election be free when a part of the voters are driven from the polls by a Legislative exclusion ?

*Strange* and *Smith & Strong*, contra.

The act of the General Assembly of February 3, 1875, amending the charter of the city of Wilmington, section 11, contains these words:

"Every male person twenty-one years old and upwards, shall be entitled to registration, who shall have resided twelve months in the State and ninety days next preceding the election, in the lot, the block and the ward in which he resides at the time of applying for registration, and no other person shall be so entitled."—*Act* 1874–'75, *chap.* 43, *sec.* 11, *p.* 467.

The validity of this clause is called in question by defendants

and the power denied to the General Assembly to superadd any further qualifications of the elector than such as are contained in the 6th article of the Constitution, in providing for the organization of municipal corporations, as directed in article VIII, sec. 4.

In opposition to this construction of the Constitution, and in support of the power exercised, requiring a residence of ninety days preceding an election in the ward, block and lot whereon the voter resides as a condition of voting, for the relator it is insisted:

I. The 6th article of the Constitution, so far as it relates to residence, is confined to such as vote in State and county elections, in the choice of officers of those political divisions of the State contemplated in the Constitution itself.

II. The entire territory of the State is divided into counties, and the Constitution further provides for a division of counties into townships. These are the only political communities recognized therein as necessary in the working of the machinery of the State government.

III. And even in the sub-division into townships, it is apparent that *residence* in a township is an essential condition of the right to vote in a township election, from the language used in Article VII, sections 5 and 7. Township officers are to be elected " *by the qualified voters thereof* " and debts can be made and taxes levied, except for necessary expenses, only " by a vote of a majority of the qualified *voters* therein." It is thus manifest that persons who have resided twelve months in the State and thirty days in the county, cannot vote in a township election unless they have the further qualification of *actual residence* in such township. If county voters could vote in township elections upon the possession only of the qualifications prescribed in Article VI, such townships would cease to be distinct political communities, and inextricable confusion and disorder would follow.

IV. The same principle, by the express words of Article VII, section 7, is applicable to *cities* and other municipal corpora-

tions, and *residence* in them is a pre-requisite to the right to vote.

V. Cities and municipal bodies, other than those mentioned, and into which the whole State is, under the Constitution, to be distributed, are to be formed and organized by the General Assembly under the express requirement of Article VIII, sec. 4, which declares it to be " the duty of the Legislature to provide for the organization of cities, towns and incorporated villages, and to restrict their power of taxation," &c. The power given is unlimited, and the duty positive to provide a government and define its powers and duties for such of these corporations as the public interest may require to be formed. The act, when within the power of the Legislature, proves the fundamental law of their respective organizations.

VI. As *residence* is a necessary condition of the right to vote in such municipal bodies formed by law, the period of that residence must be left to the discretion of the General Assembly to prescribe, and such residence for one or more months, when so required, is not only not in conflict with the Constitution, but in harmony with its provisions and its spirit.

VII. If the right to vote is given to every person who may reside in the city on the day of election, (and not otherwise disqualified), there could be no registration made in advance of such election as required by Article VI, sec. 2, inasmuch as necessarily such residence would then have to continue from such registration to the day of such election, an interval to be defined in the act itself.

VIII. If any county voter could have made himself a voter in a city by removing into such city on the day of election, not only would registration be impracticable, but stable and sound government would be impossible, and all the securities and safeguards of rights of person and property be destroyed, a result not contemplated by the Constitution.

IX. The General Assembly then must have power to mould and form these governments according to its own judgment

and discretion, except as restrained by the Constitutions of the State and of the United States.

X. The Constitution, superseded by that now in operation, conveys no distinct power to the General Assembly to organize cities and towns, and these have been formed according to its discretion. The present Constitution declares all powers, not granted, to be retained by the people, and hence it became necessary to delegate the power conferred in the Article VIII, sec. 4, and enjoin its exercise as a duty. Thus under the present, as under the former Constitution, the power of the General Assembly over cities and towns is full and complete, except as controlled by restrictions, to be found in the Constitution itself.

XI. The same construction seems to have been given by the very Convention which framed the organic law of the State in the passage of an act amending the charter of the city of Wilmington, ratified March 14th, 1868. Ordinances of Convention,uses. 1868, chap. 48, page 87.

This act recites in its preamble the incompatibility of certain provisions of the charter, then in force, nd which had been ratified February 1st, 1866, with the new Constitution, then being formed, and proceeds to repeal certain clauses in the charter which required a free-holder in the city, of $1000 value as a qualification for the office of Mayor and Alderman, and a freehold qualification. Section three then directs an election to be held for Mayor and Aldermen," which election "shall be in conformity with the provisions of this ordinance and in the manner prescribed by the 17th section of the before mentioned act of incorporation."

To ascertain the force and effect of this clause, reference must be made to the act of February 1, 1866, entitled "An Act to incorporate the inhabitants of the town of Wilmington. Private Laws of 1866, chap. 2, p. 27, section 17, declares the qualifications of the candidates and the voters at such elections shall be the same which are required of such persons by the

previous provisions of this act." Ibid, page 39, section 3, prescribes the qualifications for office, and section 4 those of voters. The latter declares : " No person shall be entitled to vote for Mayor and Aldermen, unless he shall be qualified and entitled to vote for members of the General Assembly of this State, and *shall have resided for six months next preceding the day of election within the corporate limits of said city,* nor shall any person be entitled to vote for " Aldermen of any particular ward, unless he *shall have resided in such ward for* 30 *days next before the day of election.*"

Following this interpretation, the General Assembly at its session of 1870–'71, chapter 24 of the acts of that session, passed a general law for the government of incorporated cities and towns, and confines the right of voting to such only as have, previous to any election, " resided 90 days within the corporation and 10 days within the ward in which he desires to be a voter." Battle's Revisal, page 824, section 9.

Thus we have a contemporaneous construction put upon the Constitution by the very Convention which framed it, and while it was in the very process of formation, and a ratification of the Constitution as thus interpreted by a popular vote.

The same construction has been put upon it by successive Legislatures in a series of acts extending over years, and not until now judicially questioned, organizing cities and town, and even in the very law under whose operation the defendants now hold their official positions. It is submitted that the matter is thus settled.

READE, J. Our government is founded on the will of the people. Their will is expressed by the ballot. The ballot embraces every citizen twenty-one years old, who has had a residence in the State for twelve months and in the county where he offers to vote, for thirty days. There is no other qualification required. Property qualification for voters and officeholders, which our former Constitutions required, and which

many thought important, have passed away, and are now regarded as antiquated. Not only is freedom to vote and hold office secured in our present Constitution, but it is so imbedded in the hearts of the people that it was thought necessary to stipulate against any interference with it by a contemplated Convention to alter the Constitution. The act of the last General Assembly calling a Convention has a provision that the Convention "shall not require, or propose any educational or property qualification for office, or voting," and requires the delegates to take an oath to observe it.

Whether that is wise or unwise, the Court can give no opinion. Our province is to expound the Constitution and laws as they are made, and not to make them.

The Constitution provides that every male person twenty-one years old, resident in the State twelve months, and in the county thirty days, shall be an elector—Art. VI, sec. 1. An elector for what? The Constitution does not say for what. Does it mean elector for President, or for members of Congress, or for Governor, or for Judges, or for members of the General Assembly, or for county officers, or for township or town officers, or for what else? There it stands by itself, without explanation—that every such person shall be an elector —a voter. It evidently means to designate those persons as a *class*, to vote generally whenever the polls are opened and elections held for anything connected with the general government, or the State or local governments. Just as a class of persons are designated as qualified for jurors.

And so in Art. VII, sec. 1, it is provided that all *county* elections shall be by "the qualified voters thereof." But who are they? There is no way of determining except to look back to the *class* designated above.

And so the 5th section provides, that *township* elections shall be by the "qualified voters thereof." And we have to look to the *class* to find out who they are.

And so Art. VII, sec. 7, provides that no county, *city, town,* or

other *municipal corporation* shall contract any debt, &c., unless by a vote of a majority of the "qualified voters therein;" and we have to look to the *class* to find who they are.

Here counties, cities and towns are grouped together; and so are their qualified voters. And except in this way there are no qualifications prescribed for voters in cities and towns. But cities and towns, like counties and townships, are parts and parcels of the State, organized for the convenience of local self-government. And the qualifications of their voters are the same. It follows, that the General Assembly cannot in any way change the qualifications of voters in State, county, township, city or town elections.

And yet the act, which we are considering, requires a residence of ninety days, instead of thirty. And if ninety days may be required, a year, or years, may be. And so, in many of our young and growing towns, a majority of the citizens may be excluded, and the government given to "the oldest inhabitants;" or, if long residence may be made a qualification, so it may be made a disqualification, and then the government may be given to the youngest inhabitants. And so, if *these* qualifications may be added, then any *others* may; just as we find that in one of the town charters granted by the last General Assembly, it is provided that, in addition to the citizens of the town, all persons who have lived in the county twelve months "and who own taxable real estate in said town, who have paid all the taxes," &c., shall be allowed to vote. Acts of 1874–'5, chap. 157, private laws. Surely the Legislature had no power to put any portion of the people of the State under such a government. If they can do that, then they can put Wilmington under the government of the land owners of New Hanover county.

For illustration : a man presents himself at a town election and says, I have voted in the State election, in the county election, in the township election, and now I want to vote in the town election, where I have lived thirty days. His vote is re-

jected, because he has not resided there ninety days. In vain we look in the Constitution for any such qualification. The General Assembly has disfranchised him, and that in a case which comes much nearer home to him than any other election ; for the town government affects his business, trade, market, health, comfort, pleasure, taxes, property and person.

We are of the opinion that the qualifications for a voter in a city or town are, citizenship, twenty one years of age, twelve months' residence in the State, and thirty days in the city or town.

II. Again : The act provides that before an election there shall be a registration of voters, and only those who register, can vote. The first ward is made a registration and election precinct ; and so with the second. The third ward is divided by metes and bounds, into four precincts. Of course every voter must register in the ward and in the precinct where he lives, and in no other, and must vote where he registers, the object being to prevent fraud by " repeating." But a large portion of the third ward—on the west side of the river— was, by mistake probably, not included in any of the precincts. And of course they cannot register or vote. And *Perry* v. *Whitaker*, 71 N. C. Rep., is an express decision that that makes an election void.

Indeed, it would seem that the registration provision for such parts of the city as are embraced, are so impracticable as to amount to the disfranchisement of the voters.

The Constitution ordains that the General Assembly shall provide for the registration of voters, and that no one shall vote without registration. Art. VI, sec. 2. This means that the General Assembly shall provide the conveniences and necessaries, so that the voters can register. It is to facilitate the exercise of the right of the ballot ; and not to defeat it. It is true that this includes the power and the duty to throw such guards around, as will protect the ballot from fraud. And therefore our general election law provides, that when a voter offers to register, or vote, he may be challenged, and required

to take an oath as to his qualifications. And so in our general law regulating town elections. (Battle's Revisal.)

There can be no objection to that, and it prevents no man from voting, and puts him to no inconvenience. If a man will swear that he has the qualifications, then he can register and vote; unless it can be proved against him that he is not entitled. And in that case he can be rejected. But the act under consideration is framed upon the idea of making the ballot as difficult as possible. Indeed it makes it impracticable. It provides that "any elector may, and it shall be the duty of the registrar to challenge the right of any person to register, known or suspected not to be lawfully entitled to register; and when such challenge shall be made, it shall be the duty of the registrar to require such person to prove to the satisfaction of the registrar the fact of his being of lawful age to vote, the fact of his residence for twelve months in the Sate, and for ninety days in the lot," &c. It will be noted that any bystander may challenge the voter without proving anything against him, and the voter is not allowed to swear to his qualifications; but he must prove them by the oaths of others, and these others must be known to the registrar, and the registrar must be satisfied. Now, how is it possible for persons who move into Wilmington from other counties in the State to get witnesses from a distance known to registrars in Wilmington to prove their ages and their residences? It is impossible. It is a practical denial of the right to register and vote.

III. It has been already said that towns and cities are but parts and parcels of the State for the convenience of local self-government, and that the voters, and the rights of voters, are the same as in the State government. A fundamental principle in the State government is, that representation shall be *apportioned* to the popular vote *as near as may be.* Large counties and large districts shall have more representatives than small ones, so that not only every man may vote, but his vote shall count in the representative body.

The Act creates a representative legislative body—Board of

nine Aldermen, for the city of Wilmington. Now, if every voter could vote for all of the nine Aldermen, of course every man's vote would count. Or, if the city were divided into three wards, as nearly equal as may be, and each ward elect three of the Aldermen, then every vote would count. But instead of that the city is divided into three wards—the first has about 400 voters; the second about 400; and the third 2,800. So that one vote in the first and second wards counts as much as seven votes in the third ward. That this is a plain violation of fundamental principles, the apportionment of representation, is too plain for argument. That the Legislature never intended such a result, we are obliged to assume. Nor is there anything stated in the case that can reasonably account for it. To the suggestion that it was to protect property from irresponsible voters, it is answered, that it is stated in the case, that the valuation of property in the third ward is about equal to the valuation in both the other wards put together. And to the suggestion that it was to separate the colored from the white vote, it is answered, that while most of the colored voters are in the third ward, yet there are also more white voters in the third than in both the other wards together. And to the suggestion that it was to favor the intelligent and educated and give them the control of the city government, it is answered, that by the same Legislature such a principle is expressly repudiated as existing in the present Constitution, and is expressly prohibited from being incorporated in any subsequent Constitution. The Convention " shall not require, nor propose any educational or property qualification for office or voting." And to the suggestion that it is a plan devised by the city for its better government, it is answered, that not one voter in five voted at the election.

At any rate, without questioning the intent of the Legislature, we see that the effect of the act is to violate the fundamental principles of the Constitution, and their own cherished and declared purpose to maintain free manhood suffrage, and to eschew educational or property qualifications. And, as is

15

said in *Jacobs* v. *Smallwood*, 63 N. C. Rep., it is the *effect* of the act, and not the *intention of the Legislature*, which renders it void.

It is usual in *quo warranto* to inquire first into the title of the *defendant* to the office; but we are precluded from that inquiry here by the case sent us, as we are confined to the record, which is as follows :

' Upon the foregoing facts it is submitted to the honorable, the Superior Court of New Hanover county, to determine the following questions :

1. Whether the relators of the plaintiff are now entitled to the said office of Aldermen of said city ?

2. If not entitled now, will they be so entitled from and after the first Thursday in August, &c. ?"

And it is agreed that if the Court shall be of opinion in the affirmative upon either one of said two questions, judgment shall be rendered that the defendants shall be ousted from the said offices, and that the relators be put in possession thereof.

(Signed)        ROBERT STRANGE,
                GEORGE DAVIS,
                    Attorneys for the Plaintiffs.
                DANIEL L. RUSSELL,
                EDWARD CANTWELL,
                    Attorneys for Defendants.

It was insisted upon the argument here, that if the title of the relators is bad, the title of the defendants is bad also, and for the same reason. But it will be seen that the only point presented to us is, as to the title of the *relators*.

There is error.

Rodman, J. I concur in the judgment of the Court; but as I cannot concur in some of the reasons of the majority, as expressed by Justice Reade, it is proper to state wherein I differ from my Associates, and my reasons for the difference :

1. I concur in thinking that the Legislature has no right to

require a residence of *ninety* days in the city of Wilmington, as a qualification of voters in a city election. Much less has it a right to require such a length of residence on *the same lot.* The Constitution requires as a qualification of voters, a residence of twelve months in the State, and of thirty days within the county where they offer to vote. It says nothing about residence in a city as a necessary qualification to vote in a city election. It must be conceded, however, that no person can vote at a city election unless he resides in the city at the time he offers to vote.

I think also, that it is within the power of the Legislature to require as a qualification that the voter shall have resided for a reasonable time within the city. There can be no reason why every person (otherwise qualified,) who *actually and bona fide* resides in a municipality, be it a State, county, township or city, at the time he offers to vote therein, should not be allowed to vote. But it is also reasonable to require that the *bona fides* and intended permanency of the residence shall be clearly proved, and this can be best done by showing that it has existed for a time long enough reasonably to create the presumption of good faith and permanency.

This time, the Constitution has fixed as to counties, at thirty days. And the rule is equally applicable to cities, if the Legislature think proper to apply it. The Legislature may shorten the time which will create the presumption of good faith and permanency, but they cannot extend it beyond what the Constitution says shall be sufficient for that purpose. If they can extend the time beyond thirty days, there is no limit.

As a ward of a city has no separate government or interest distinct from that of the city, there would seem to be no reason in requiring any time of residence in a certain ward as a qualification for voting for city officers, as distinct from ward officers, if there be any such.

But to require that the voter shall have resided for any definite time on the same lot, evidently makes a disqualification which can find no sanction in the Constitution, or in justice

or in reason. In large cities most of the inhabitants are boarders or tenants. Under the act we are considering, if a voter should leave a hotel for another, or if his lease should expire and he should remove to another residence in the same city, within ninety days before an election, he would be disqualified. It cannot be necessary to say more on this part of the case, except to observe that the act was enacted only about forty days before the election.

2. I also agree with the majority of the Court in its view of that part of the act which requires voters, before being registered, and also if challenged, before voting, to prove their qualifications by witnesses, *personally known to the registrars and poll-holders.*

These officers are, in a certain sense, judges. The registrar (to confine myself to him,) must be satisfied of the qualifications of a voter before registering him, by the same rules of evidence which apply to other judges of facts, and an action would be against him if, after reasonable proof of qualification, he should *maliciously* refuse to register a person entitled to registration. No doubt the Legislature may enact *general laws* admitting or disqualifying certain classes of witnesses, but its power cannot be unlimited in this respect. I conceive it has no right to enact a rule of evidence for a particular case; or to impose such qualifications on witnesses as practically leave the admission of the evidence to the arbitrary opinion of the Judge, without liability to review; or to make the competency of witnesses in a particular class of cases dependent on a mere accident, and independent of any rule professing even to be founded in reason. What could be said for a law which made the competency of a witness in all cases, for example, on trials for murder, to depend upon the irrelevant accident, that the witness was, or was not, *personally* known to the Judge, or jury; and which left it in the discretion of the Judge to admit or deny his personal acquaintance, according to his caprice.

The injustice and folly of such a law would be so gross, that

its validity would not find an advocate. Yet that is a part of the act we are considering. The right to vote is property, and no man can be deprived of it "but by the law of the land." (Bill of Rights, sec. 17,) and the arbitrary will of a registrar or of a judge is not "the law of the land," in the well settled meaning of the Bill of Rights.

The requirement that the witnesses to the qualification of a voter shall be personally known to the registrar, is a new and most unreasonable addition to the qualifications for voters, which the Constitution prescribes, and in my opinion is clearly beyond the power of the Legislature.

3. In the third proposition of the majority, I do not concur.

The Constitution gives to the Legislature the general power of legislation, subject only to certain specified restrictions. The legislative power includes as part of itself the power to create and regulate municipal corporations, to prescribe what officers there shall be, the manner of electing them, (subject of course, to any Constitutional provisions which may be applicable,) their powers, &c. The Legislature may do this by a special act for any particular municipality, for this power is clearly given by Art. VII., sec. 1, of the Constitution. In the power to create and provide for the orgnization of a city, whether this power be derived from any special provisions of the Constitution, or general grant of legislative power, it seems to me, must be included the power to divide it into wards. [See 1 Dillon Mun. Corp., sec. 19.] This being conceded, I find nothing in the Constitution which restrains the legislative power in its action on this subject, or requires that the several wards shall be equal in area, population or taxable property; or forbids that each ward, however unequal in all of those respects, shall send the same number of representatives to the city council. It must be admitted that there is no express restraint on the legislative power in these respects. But it is argued that there is a general spirit of intent to be gathered from the Constitution, to the effect that every voter shall have an equal weight in electing public officers, and in the govern-

ment of the State, or of the subordinate municipality to which he belongs. It has been said by some one before, that it is dangerous to undertake to construe a Constitution upon what may be supposed to be its general spirit, for one may be easily misled by a prepossession as to what that spirit ought to be, and the results, even of the most impartial inquiry into so uncertain a subject, can never be certain. For my part, I find no indication of any such general intent, and certainly of none which can be applied to cities and towns, by any admitted rules of reasoning.

Art. II, sec. 6, says that the House of Representatives shall be composed of one hundred and twenty representatives, to be elected by the counties respectively, according to their population, *and each county shall have at least one representative, although it may not contain the requisite ratio of representation.* Section 7 provides how the ratio of representation shall be ascertained, and how fractions shall be carried over, with the view of producing something like an approximation of representation to population.

These provisions are merely directory. They look only to the existing, or some similar division of the State into counties. It is left open to the Legislature to create new counties, as it has repeatedly done, without any objection to its constitutional power to do so. For aught that I see in the Constitution, it might divide the State into one hundred and twenty counties of unequal area, population and taxable property, when each would be entitled to one representative in the House. I think this instance, without going farther, is sufficient to show that there is no general controlling intent in the Constitution restraining the Legislature from an unequal distribution of political power.

That this power may be abused for partizan ends, there can be no doubt. It is indifferent to me whether in this case it has been abused, or not. This Court has authority to repress an usurpation of legislative power, but not to correct a mere

abuse of it. For that, the Legislature is responsible to the people alone.

It is proper here to notice a position taken in argument by the learned counsel for the plaintiff, which might seem to find some countenance in the generality of my expressions, as to the legislative power to create, organize, and regulate, municipal corporations. The contention of the learned counsel was, that the Legislature might itself *appoint* the municipal officers, and consequently, if it allowed them to be elected, had an unlimited power to prescribe the qualifications of the electors. I do not think that this conclusion fairly follows, from the concession to the Legislature of general legislative power over such corporations. The appointment of officers, except merely temporarily, and for the purpose of organization, is not properly a part of the legislative power. It is not included under the general grant, and clearly, it is not elsewhere specifically granted. Therefore, under section 37, of the Bill of Rights, it remains with the people, that is to say, with the people of the locality in which the office is to be exercised.

From this reasoning my conclusions are:

1. That the Legislature may constitutionally divide a city into wards unequal in population, &c., and give to each ward an equal representation in the city council.

2. That it cannot require any qualification for voters in city elections additional to those required by the Constitution for voters in general.

3. It may require a residence of thirty days within the city before voting, as an assurance of *bona fide* residence within the city at the time of voting.

4. That the proof of the qualification of a voter cannot be materially other than is competent under the general rules of evidence.

PER CURIAM. Judgment reversed, and judgment here that the relators are not entitled to the office.